# United States Court of Appeals
## For the First Circuit

_____

15-1170

IN RE DZHOKHAR TSARNAEV,
Petitioner.

_____

Before

Lynch, <u>Chief Judge</u>,
Torruella and Howard, <u>Circuit Judges</u>.

_____

<u>Judith Mizner</u>, with whom <u>William W. Fick</u> and the <u>Federal Public Defender Office</u> were on brief, for the petitioner.

<u>William D. Weinreb</u>, with whom <u>Carmen M. Ortiz</u>, United States Attorney, <u>Aloke S. Chakravarty</u> and <u>Nadine Pellegrini</u> were on brief, for the respondent.

_____

February 27, 2015

_____

**Per Curiam**.   Petitioner Dzhokhar A. Tsarnaev asks this court to compel the district court to grant a change of venue because of widespread pretrial publicity that he alleges has so tainted the potential jury pool that he will be unable to receive a trial before a fair and impartial jury in Boston.  See generally Second Petition for Writ of Mandamus.  We deny the Second Mandamus Petition because petitioner has not met the well-established standards for such relief and so we are forbidden by law from granting it.

The Supreme Court's admonition over a century ago is true today:

> The theory of the law is that a juror who has formed an opinion cannot be impartial.  Every opinion which he may entertain need not necessarily have that effect.  In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.

Reynolds v. United States, 98 U.S. 145, 155-56 (1878).

Thus, any high-profile case will receive significant media attention.  It is no surprise that people in general, and especially the well-informed, will be aware of it.  Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process.

Trials have taken place in other high-profile cases in the communities where the underlying events occurred. After the 1993 World Trade Center bombing, which killed six and injured over a thousand people and inflicted hundreds of millions of dollars in damage, the six conspirators charged were each tried in the Southern District of New York. The district court denied change-of-venue motions in each case, the first less than a year after the bombing. See United States v. Yousef, No. S12 93-Cr.0180, 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997); United States v. Salameh, No. S5 93-Cr.0180, 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993) (finding less than a year after the bombing that a jury in New York would be "willing to try this case with an open mind" and able to "render a decision based solely upon the evidence, or lack thereof," even if the jurors had heard of the bombing before). After the conviction in Yousef, the Second Circuit affirmed. United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003).

Indeed, after the September 11 terrorist attacks in 2001, the prosecution of Zacharias Moussaoui was brought in the Eastern District of Virginia, minutes by car from the Pentagon. The district court denied a change of venue motion, and the Fourth Circuit dismissed Moussaoui's interlocutory appeal. United States v. Moussaoui, 43 F. App'x 612, 613 (4th Cir. 2002).

Further, the events here, like the 1993 bombing of the World Trade Center and the September 11, 2001 attacks, received

national and international attention. Petitioner does not deny that a jury anywhere in the country will have been exposed to some level of media attention. Indeed, his own polling data shows that, in his preferred venue, Washington D.C., 96.5% of survey respondents had heard of the bombings at the Boston Marathon.

The mandamus relief sought is an extraordinary remedy, rarely granted, and has stringent requirements. To convince an appellate court to intervene is to employ "one of the most potent weapons in the judicial arsenal." Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380 (2004) (citation and internal quotation marks omitted). To compel the district court to change course, a petitioner must show not only that the district court was manifestly wrong, but also that the petitioner's right to relief is clear and indisputable, irreparable harm will result, and the equities favor such drastic relief. Id. at 380-81, 390. In the case before us, we cannot say petitioner has met these onerous standards and so relief must be denied.

**I.**

Petitioner is charged with multiple crimes arising out of the bombings at the Boston Marathon on April 15, 2013, killing three and injuring over 200. Some of these crimes potentially carry the death penalty. On June 18, 2014, petitioner filed his first motion to change venue claiming that pretrial publicity and the attendant public attitudes were so hostile and inflammatory

-4-

that a presumption of prejudice had arisen requiring that he be tried in a different district. On September 24, 2014, the district court denied the motion in a thorough and detailed order. In its order, the court addressed the evidence used by petitioner in support of his motion and, applying the standards set out in Skilling v. United States, 561 U.S. 358 (2010), concluded that petitioner had failed to demonstrate that pretrial publicity rendered it impossible to empanel a fair and impartial jury in the District of Massachusetts. Petitioner did not seek mandamus at the time of the first motion's denial.

On December 1, 2014, petitioner filed a second motion to change venue, arguing that the need for a change of venue had become more acute because of continuing prejudicial publicity in the media and alleged leaks of information by government sources. On December 31, 2014, without waiting for the district court's written decision on the second motion, petitioner filed his first mandamus petition with this court. On January 2, 2015, while that petition before us remained under consideration, the district court issued its written decision on the second venue motion, noting that the new motion did not raise any genuinely new issues apart from those in the first motion and concluding that no presumption of prejudice had arisen that would justify a change of venue. On January 3, 2015, this court denied the motion to stay jury selection and the first petition, concluding that petitioner had

"not made the extraordinary showing required to justify mandamus relief."    In re Tsarnaev, 775 F.3d 457 (1st Cir. 2015).

Jury selection commenced on January 5, 2015, and continues to date.  On January 22, 2015, petitioner filed in the district court his third motion to change venue in which he asserted that the detailed and extensive questionnaires completed by the 1,373 prospective jurors comprising the venire, combined with the record of individual voir dire compiled to date, mandated a change of venue because of pervasive bias and prejudgment uncovered during that process.  After petitioner filed this Petition, the district court denied the Third Motion for Change of Venue, in part for the reasons set forth in its earlier decisions, and in part because "the voir dire process is successfully identifying potential jurors who are capable of serving as fair and impartial jurors in this case." United States v. Tsarnaev, No. 13-CR-10200-GAO (D. Mass. Feb. 6, 2015).  "In light of that ongoing experience," the district court concluded, "the third motion to change venue has even less, not more, merit than the prior ones." Id.  The court further maintained that "[c]oncerns about jurors who have fixed opinions or emotional connections to events, or who are vulnerable to improper influence from media coverage, are legitimate concerns.  The [c]ourt and the parties are diligently addressing them through the voir dire process."  Id.

This court held a hearing on the Second Petition for Mandamus on February 19, 2015, and allowed supplemental filings.

The Second Petition for Mandamus before us largely makes the same claims and relies on the same types of data as the Third Motion for Change of Venue which the district court denied. Petitioner argues that a presumption of prejudice exists here because aggregated data shows too many in the community and in the jury pool have expressed the opinion he is guilty and that those jurors have been affected by, or have connections to, the crime. He claims the continuing media attention exacerbates these problems. He argues that the judge erred in rejecting his claim that presumed prejudice has been established. From this, he argues, voir dire cannot succeed in finding a fair and impartial jury. This is so, he argues, even if the trial judge after voir dire qualifies a jury after determining the jurors so qualified to be fair and impartial. At this point, the trial judge has not sat a jury, but rather has identified over sixty provisionally qualified jurors who are still subject to peremptory challenges.[1] We conclude that petitioner fails to demonstrate a clear and indisputable right to relief.

---

[1] The parties have each received twenty-three peremptory challenges, three more than required by the applicable rule. Fed. R. Crim. P. 24(b)(1).

**II.**

The writ of mandamus is a "drastic" remedy; given its potential "to spawn piecemeal litigation and disrupt the orderly processes of the justice system," mandamus "must be used sparingly and only in extraordinary situations." In re Pearson, 990 F.2d 653, 656 (1st Cir. 1993) (citations and internal quotation marks omitted). It is reserved for the "immediate correction of acts or omissions" by the district court "amounting to an usurpation of power." Id. (citation and internal quotation marks omitted). Indeed, "mandamus is generally thought an inappropriate prism through which to inspect exercises of judicial discretion," In re Bushkin Assocs., Inc., 864 F.2d 241, 245 (1st Cir. 1989), and the jury selection process involves some measure of discretion. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense.'" Skilling, 561 U.S. at 386 (alteration in original) (quoting Mu'Min v. Virginia, 500 U.S. 415, 427 (1991)). We are unable to conclude that the district court's reasoned conclusion based on the facts and the law in this case warrants issuance of such extraordinary relief.

**A.**     **The Mandamus Standard Applicable Here.**

The intersection of two constitutional mandates lie at the heart of resolution of petitioner's mandamus claim. First, both Article III and the Sixth Amendment provide that a criminal defendant shall be tried in "the State where the . . . Crimes . . . have

been committed." U.S. Const. art. III, § 2, cl. 3; see also id. amend. VI (right to trial by "jury of the State and district wherein the crime shall have been committed").

Second, the Sixth Amendment "secures to criminal defendants the right to trial by an impartial jury." Skilling, 561 U.S. at 377; see also U.S. Const. amend. VI. This right, ensuring the defendant "a fair trial," has also been characterized as "a basic requirement of due process." Skilling, 561 U.S. at 378 (citation and internal quotation marks omitted). In some situations, these constitutional mandates may be in tension. Notwithstanding the constitutional command that trials take place where crimes are committed, the defendant's rights to an impartial jury and a fair trial may require that in extreme cases the trial be moved to a venue other than where the crime was committed. We have described such cases as those where "there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial." United States v. Quiles-Olivo, 684 F.3d 177, 182 (1st Cir. 2012).[2] In those rare, extreme circumstances it may be

_____

[2] Rule 21(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." "Generally, a presumption of prejudice is reserved for those extreme cases where publicity is both extensive and sensational in nature. Stated differently, Rule 21(a)'s requirements tend to almost exclusively apply in cases in

"a denial of due process of law to refuse the request for a change of venue." Rideau v. Louisiana, 373 U.S. 723, 726 (1963).

Importantly, if petitioner goes to trial without a change of venue now and is convicted, he will have the opportunity to raise a challenge based on lack of a fair and impartial jury on direct appeal. Indeed, that is the customary mechanism by which such challenges are presented and assessed. See, e.g., Quiles-Olivo, 684 F.3d at 182–84.[3]

Instead of traveling that typical route, petitioner asks this court for a writ of mandamus at this pretrial stage. And the mandamus petition in this case is particularly unusual. It came in the process of ongoing jury selection and is an attempt to prevent a trial in this jurisdiction from going forward. Petitioner urges this appellate court to intervene and halt that juror selection process in the trial court. He does so despite the fact that, the district court, sitting in the "locale where the publicity is said to have had its effect," necessarily and properly under the law draws on its "own perception of the depth and extent of news

---

which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." Quiles-Olivo, 684 F.3d at 182 (1st Cir. 2012) (citations, internal quotation marks, and alteration omitted).

[3] At oral argument, it was the position of petitioner that denials of motions to change venue are reviewed for abuse of discretion and that a clear abuse of discretion would give rise to a clear entitlement to relief. Petitioner characterized "the change of venue in this case" as being "at the heart of the Sixth Amendment" right to trial by an impartial jury.

-10-

stories that might influence a juror." Mu'Min, 500 U.S. at 427. The district court has not yet completed that process, and we are mindful that an appellate court's "after-the-fact assessments of the media's impact on jurors . . . lack the on-the-spot comprehension of the situation possessed" by the trial judge. Skilling, 561 U.S. at 386; see id. at 378 n.11 ("[D]istrict-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect.").

Because petitioner's venue claim "arises not on direct appeal after trial but on petition for a writ of mandamus," it is subject to "an even more exacting burden" than it would be on direct appeal. In re Bulger, 710 F.3d 42, 45 (1st Cir. 2013).[4] The petitioner must "satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." Id. (citations, internal quotation marks, and alteration omitted). That standard of review is extraordinarily deferential to the ruling of the trial judge. In our cases, "mandamus has customarily been granted only when the lower court was clearly without jurisdiction, or exceeded its discretion to such a degree that its actions amount to a usurpation of power." In re Recticel Foam

---

[4] For purposes of this opinion, we will assume that the petitioner can prove his argument that the district court's denial of the pretrial Third Motion for Change of Venue is subject to mandamus review at all, see In re Kouri-Perez, 134 F.3d 361 (1st Cir. 1998) (unpublished per curiam), though not all circuit courts agree.

Corp., 859 F.2d 1000, 1006 (1st Cir. 1988) (internal quotation marks, citations, and alteration omitted).  As we explain below, neither of those conditions is true here.

In addition to overcoming the daunting first requirement, petitioner must also meet two other standards.  First, he must demonstrate that he has no other adequate source of relief; in other words, he must show irreparable harm.  In re Bulger, 710 F.3d at 45 (citation omitted).  This condition is "designed to ensure that the writ will not be used as a substitute for the regular appeals process," Cheney, 542 U.S. at 380-81 (citation omitted), which, as we have noted, remains open to petitioner after trial should he be convicted.  Petitioner does not rely on an argument that he will suffer irreparable injury, but argues a failure to accept his argument is so obviously wrong, the irreparable injury is to the reputation of the federal judicial system.  And, second, "a petitioner must demonstrate that, on balance, the equities favor issuance of the writ."  In re Bulger, 710 F.3d at 45.

Together, these standards mean that, when considering a petition for the extraordinary writ of mandamus, an appeals court is bound to employ an extraordinarily deferential form of review. Relief may be allowed here only (1) if it is clear and indisputable that the district court erred in denying petitioner's Third Motion for Change of Venue, (2) petitioner would suffer irreparable harm if the district court were not ordered to change venue, and (3) the

-12-

equities clearly favor the petitioner.  See id. at 45-46.  These onerous standards have not been met here.

**B.**        **It is not Clear and Indisputable that Pretrial Publicity Requires a Change of Venue.**

We are bound by the Supreme Court's decision in Skilling, a case in which the venue question was examined after conviction. This case, by contrast, is an attempt to force a trial judge to change venue despite his findings that no presumption of prejudice has arisen, and that there are jurors provisionally qualified to date[5] capable of providing defendant with a fair trial.  Skilling involved the criminal prosecution of Jeffrey Skilling, a former Enron executive, for certain crimes committed prior to Enron's much-publicized collapse which badly harmed the city of Houston. Skilling twice moved to change venue from Houston, Enron's home city, and the district judge denied both motions.[6]  After Skilling was convicted of some, but not all, of the charges against him, he appealed, asserting, inter alia, a fair-trial claim which encompassed two questions: first, whether the district court erred by failing to move the trial to a different venue based on a

_____

[5]    The "provisionally qualified" jurors are still to be subject to peremptory challenges.

[6]    Skilling first moved for change of venue four months after he was indicted; he renewed the motion three weeks before trial, shortly after a co-defendant pleaded guilty.  See Skilling, 561 U.S. at 369, 372.  Skilling's trial did take place without changing venue and his claims were thereafter considered and rejected on direct appeal.

presumption of prejudice and, second, whether actual prejudice contaminated the jury which convicted him.

The Supreme Court first surveyed and distinguished its earlier cases, including Rideau v. Louisiana, 373 U.S. 723 (1963), and discussed the differences between those cases and Skilling. The Court then discussed several considerations that informed its conclusion that the publicity in Houston had not produced a presumption of prejudice. First, the Court examined the size and characteristics of the community in which the crimes occurred. Out of Houston's population, 4.5 million people were eligible for jury service, a much greater number than the small area the Court considered in Rideau. Second, while there was a widespread community impact from the crimes, Skilling held that with careful identification and inspection of prospective jurors' connections to Enron, a jury with non-existent or attenuated links to Enron could be seated. The Court considered the "widespread community impact" of Enron's failure and the guilty plea of a co-defendant shortly before trial, and concluded in each instance that the "extensive screening questionnaire and follow-up voir dire were well suited" to the task of identifying and inspecting the possible effects of these influences. Skilling, 561 U.S. at 384-85. Third, while the press coverage of Skilling was "not kind," the Court found it significant that the news stories about him "contained no confession or other blatantly prejudicial information of the type

readers or viewers could not reasonably be expected to shut from sight." Id. at 382. Fourth, the Court noted that several years' time passed between Enron's collapse and Skilling's trial during which the "decibel level" of media attention dropped. Id. at 383. Considering all of these factors, the Court held that no presumption of prejudice arose and that the district court did not violate constitutional limitations in declining to change venue. Id. at 385.

It is apparent that petitioner cannot meet the high bar set for mandamus relief, based on the parties' submissions and the parts of the record the parties have relied on in their arguments to us. Petitioner argues that the bombings have so impacted the entire Boston-area community that we must presume prejudice for any jury drawn from the Eastern Division of Massachusetts.[7] Yet his own statistics reveal that hundreds of members of the venire have not formed an opinion that he is guilty. The voir dire responses have confirmed this. Petitioner's selective quotations from the

---

[7] We have a different view than the dissent's description of the courthouse and its environs. While jury selection has been going on there was not a courthouse view of a dump truck or a view of a construction site showing a Boston Strong banner. Presumably the dissent is referring to a photograph taken of a banner on a partially constructed building from early 2014, which has not been present during jury selection in 2015. Nothing can be seen from the courthouse of any banner at this time. Nor has the petitioner claimed that any members of the jury pool present at the courthouse were exposed to the cement mixer on the single day it was present in the area. Even if these assertions were true, that does not show presumed prejudice of any sort.

sealed materials are, as the district court said, misleading. Our own review of those materials shows that the district court is in fact identifying provisionally qualified jurors with no or few and, at most, attenuated claimed connections to the bombings.

Boston, like Houston in Skilling, is a large, diverse metropolitan area. Boston-area residents obtain their news from a vast array of sources. By contrast, in Rideau, a 1963 case from Louisiana, the Court found it was a denial of due process to have refused a request for change of venue where at least 50,000 people in an area of 150,000 saw the video of a staged interview by the Sheriff resulting in a "confession" by defendant, who had not been advised of his right to counsel. 373 U.S. at 724-26. The Supreme Court characterized this as a "kangaroo court." Id. at 726.[8]

While there has been extensive publicity in this case, the atmosphere here is not to be characterized as disruptive to the ability of the petitioner to be adjudged by a fair and impartial jury. This case is in sharp contrast with Estes v. Texas, 381 U.S. 532, 536 (1965), where pretrial publicity and the televising of proceedings in a notorious criminal case resulted in setting aside the conviction despite absence of showing of prejudice. This case is unlike the atmosphere of "bedlam," in Sheppard v. Maxwell, 384 U.S. 333, 355, 363 (1966), where the trial judge did not fulfill

_____

[8] Indeed, the Court relied on prior cases in which so-called "voluntary confessions" were extracted by brutal force. Rideau, 373 U.S. at 726.

-16-

his duty to protect a murder defendant from inherently prejudicial publicity which saturated the community or to control disruptive influences in the courtroom during trial.  Nor is this case marred by the repeated broadcast of a defendant's questionable taped confession two months before trial in a small area of 150,000 people, as in Rideau, 373 U.S. at 724.  As petitioner's counsel has admitted, there is no confession at all here.  Indeed, much of what petitioner calls "publicity" consists of factual news media accounts of the events of that period.  The publicity petitioner has received, while "not kind," Skilling, 561 U.S. at 382, has not been of the grossly prejudicial character that attended Rideau.

The nearly two years that have passed since the Marathon bombings has allowed the decibel level of publicity about the crimes themselves to drop and community passions to diminish.  See Patton v. Yount, 467 U.S. 1025, 1034 (1984).  It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally.  But that would be true wherever trial is held, and the reporting has largely been factual.  These factors persuade us that petitioner has not demonstrated a clear and indisputable right to relief based on a presumption of prejudice from pretrial publicity.

Petitioner's heavy reliance on Irvin v. Dowd, 366 U.S. 717 (1961), does not assist him.  The facts are very different. Irvin must also be understood in light of later caselaw such as

<u>Skilling</u> and <u>Patton</u>.  In <u>Irvin</u>, a state habeas case, the defendant was suspected of committing six murders near Evansville, Indiana. He was arrested and thereafter a barrage of highly personalized publicity "was unleashed against him during the six or seven months preceding his trial," <u>id.</u> at 725, including a statement by the police and prosecutor that he had confessed to all six murders. <u>Id</u>. at 719-20.  Indeed, many of the press references described the defendant as the "confessed slayer of six, a parole violator and fraudulent-check artist."  <u>Id</u>. at 726 (internal quotation marks omitted).  In addition to the reported confession, there were stories about Irvin's criminal history, his police line-up identification, that he faced a lie detector test, and that he had been placed at the scene of the crime.  The press reported Irvin's "offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted)."  <u>Id</u>. at 725-26.  The very day before the trial, the newspapers reported that Irvin had admitted to all six murders.  <u>Id</u>. at 726.

After venue was moved to an adjoining county for his trial on one murder charge, the voir dire commenced only eleven months after the murder was committed and eight months after he was arrested and confessed.  In that very small community of 30,000, in

which the local newspapers containing the inflammatory articles were delivered to 95% of the households, the details of defendant's confession and offer to plead guilty if promised a 99-year sentence, combined with the details of his criminal history, required vacation of the lower court judgments. The trial court itself excluded 62% of the venire "for cause as having fixed opinions as to" defendant's guilt. Id. at 727. Ninety percent of those prospective jurors undergoing voir dire -- conducted, incidentally, "in front of all those remaining in the panel," Patton v. Yount, 467 U.S. 1025, 1034 n.10 (1984) -- "entertained some opinion as to guilt -- ranging in intensity from mere suspicion to absolute certainty." Irvin, 366 U.S. at 727. The voir dire of the jurors who actually sat in judgment of the defendant revealed that eight of twelve thought he was guilty at the outset. Id. That is a far cry from the situation before this court.

Irvin, in fact, was followed twenty-three years later by Patton, where the Supreme Court found no denial of the defendant's right to an impartial jury. There,

> [t]he voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box. This was a higher percentage than in Irvin, where 62% of the 430 veniremen were dismissed for cause because they had fixed opinions concerning the petitioner's guilt. Finally, . . . 8 of the 14 jurors and alternates actually seated admitted that at some time they had formed an opinion as to Yount's guilt.

-19-

*Patton*, 467 U.S. at 1029-30 (footnotes omitted).  The Court emphasized the passage of time and its effect on the fixedness of prospective jurors' opinions, saying some had forgotten and others "would need to be persuaded again."  *Id*. at 1034 (footnote omitted).  It was thus not simply the existence of opinions among prospective jurors, but the degree of their fixedness, that was critical to the Court.  As the Court emphasized, "[p]rospective jurors represent a cross section of the community, and their education and experience vary widely. . . . Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially."  *Id*. at 1039.  This admonition undercuts petitioner's key argument that poll percentages and jury questionnaire answers decide the question of a presumption of prejudice.

Here, we cannot say that the district court clearly and indisputably erred in concluding that the publicity surrounding petitioner's pretrial proceedings -- and the community's knowledge about the Boston Marathon bombings -- has not crossed from familiarity, as in *Patton*, to the prejudice evidenced in a case like *Irvin*.

Petitioner and the dissent also compare this case to a district court's exercise of discretion to change venue in *United*

States v. McVeigh, 918 F. Supp. 1467 (W.D. Okla. 1996).[9] The issue in McVeigh was not whether the venue of the Oklahoma City bombing trial should be moved from Oklahoma City, where the crime was committed. The parties -- including the government -- agreed to move the trial. Id. at 1470. There is no such agreement here. The question in McVeigh, instead, was whether to move the trial elsewhere in Oklahoma or out of the state entirely.

That trial judge's exercise of discretion in McVeigh to move the trial to Denver says nothing about how the trial judge here should exercise his discretion. Nor was it meant to. As the judge in McVeigh wrote, "[t]here are so many variables involved that no two trials can be compared regardless of apparent similarities." Id. at 1473. Insofar as the cases are similar, the McVeigh judge's decision to move the trial to Denver does not suggest that a decision to keep this trial in Boston is an abuse of discretion -- much less a clear and indisputable one.

The dissent asks the rhetorical question "if not here, when?" The Supreme Court answered that question in Rideau, where an unrepresented defendant's twenty-minute, in-depth confession in the form of an "interview" with the Sheriff was recorded and broadcast multiple times in a small Louisiana parish. That interview and not the later trial, the Court found, "in a very real

---

[9]    In footnote 36 of the dissent, our dissenting colleague has made an unfounded argument that not even petitioner has made.

-21-

sense was Rideau's trial--at which he pleaded guilty to murder."
Rideau, 373 U.S. at 726.  Three of the jurors had viewed the
interview at least once, and two members of the jury were deputy
sheriffs.  Id. at 725.  Here, by contrast, no such thing occurred.[10]

**C.**        **The Ongoing Jury Selection Process Does Not Suggest Pervasive Prejudice.**

Beyond the publicity itself, petitioner also relies on
the responses to jury questionnaires and the content of the voir
dire as a basis for finding prejudice. He asserts that what we have
seen from the juror selection process confirms that pretrial
publicity has indisputably raised a presumption of prejudice
sufficient to mandate that his trial be moved.  Petitioner's
essential claim is thus that the prejudice against him is so great
that nothing the district court can do will offset it.  Every
potential juror in the Eastern Division of Massachusetts is
automatically disqualified, he maintains.  That alone is a
remarkable assumption about the five million people in the Eastern
Division and one much to be doubted.  Our dissenting colleague,
too, argues that this "second analytical route," based on the
course of the jury selection to date, reveals an irrefutable
presumption of prejudice among the jury pool.  The careful

_____

[10]     The dissent's remarkable statement that the image of the
petitioner being taken from a boat was "quite likely seen by nearly
100% of the Eastern Division of Massachusetts population" is
completely unfounded; we can find no basis in the record for that
contention.

-22-

selection process and the trial judge's expressed confidence in finding sufficient jurors, however, is supported by the record and persuasively undercuts this argument.[11]

First, it is necessary to describe the ongoing jury selection process that has been underway in the district court. In doing so, we observe that our caselaw says that "[a] guiding beacon . . . is the trial judge, who is responsible for conducting the voir dire and to whom we defer from our more distant appellate position." Quiles-Olivo, 684 F.3d at 183. The process utilized here in many ways mirrors the one which the Supreme Court found appropriate in Skilling. See 561 U.S. at 387-89. Here, the district judge summoned over a thousand prospective jurors, divided those jurors into six panels, and requested that they fill out a long and detailed one-hundred-question questionnaire under oath. The parties were permitted to confer and file under seal a report with respect to each panel, listing the persons whom the parties

_____

[11] Petitioner does not make an argument that his jury will suffer from actual prejudice. Nor could he. A post-trial finding of "[a]ctual prejudice hinges on whether the jurors seated at trial demonstrated actual partiality that they were incapable of setting aside." Quiles-Olivo, 684 F.3d at 183 (citation and internal quotation marks omitted). At this point, a jury is in the process of being selected and has not been seated for trial. There can be no viable claim that the yet unseated and not even finally qualified jurors would result in a jury which suffers from actual prejudice. To the extent petitioner now claims that all of the provisionally qualified jurors suffer from presumed or actual prejudice, our review of the entire record satisfied us that it is not clear and indisputable the provisionally qualified jurors are biased or that the district court erred.

agreed should be excused for cause.  Thereafter, the parties were ordered to file separately under seal a report suggesting specific follow-up issues or questions to be pursued in the course of individual voir dire.

Smaller groups of twenty to twenty-five prospective jurors have come to the Boston courthouse,[12] and, one by one, have been questioned first by the court and then with follow-up from the parties.  At the end of each day, counsel have conferred and agreed that certain jurors should be struck for cause or for hardship. The court has heard argument on contested jurors and reached a decision about which prospective jurors in the day's group may be deemed provisionally qualified.

We have reviewed the entire voir dire conducted to this point by the court and the parties and the process has been thorough and appropriately calibrated to expose bias, ignorance,

_____

[12]    Petitioner has never made the claims now made by the dissent that security arrangements at the Boston courthouse as to the trial have somehow contaminated the potential jury pool, such that the jurors eventually picked cannot be fair and impartial.  Indeed, we reject the dissent's "impression" that security is necessary because petitioner is "extraordinarily dangerous."  Security, to the contrary, no doubt will contribute to the safe and orderly conduct of the trial.  Further, the dissent cannot and does not purport to describe the security arrangements for the jurors who will sit.  Importantly, even if this case were transferred to a federal courthouse in another place, appropriately high security arrangements would be in place.  This simply is not an appropriate consideration in this case.

-24-

and prevarication.[13]  As the district court noted in denying the Third Motion for Change of Venue,

> the experience of voir dire suggests . . . that the full process -- including summonsing an expanded jury pool; utilizing a lengthy questionnaire jointly developed by the parties and the [c]ourt; giving the parties ample time to review questionnaires, research jurors, and consult with their jury selection advisers; and permitting both the [c]ourt and the parties to conduct thorough voir dire -- is working to ferret out those jurors who should appropriately be excused for cause.

Our dissenting colleague comes to the opposite conclusion, claiming that the length of the jury selection process and the responses of the venire thus far indicate pervasive prejudice.  In doing so, however, the dissent confuses mere exposure to publicity with "disqualifying prejudice" -- only the second of which, when widespread throughout the jury pool, is particularly relevant to a presumption of prejudice.  See United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990) ("Where a high percentage of the venire admits to a disqualifying prejudice,

---

[13]  The bombings in Boston, the murder of a policeman, and the other criminal events charged did in fact take place and were heavily covered by the media around the world. As Reynolds instructs, that is a separate matter from the matter of whether petitioner is guilty of the crimes charged. See 98 U.S. at 155-56. Seeing media coverage of the former does not mean the viewer is prejudiced.  Further, many in the provisionally qualified pool did not follow that coverage.  Similarly, the Boston Strong theme is about civic resilience and recovery.  It is not about whether petitioner is guilty or not of the crimes charged. That someone buys a Boston Strong T-shirt is not proof that he or she could not be fair and impartial if selected as a potential juror on the question of guilt.

a court may properly question the remaining jurors' avowals of impartiality. . . ." (emphasis added)).

As an initial matter, the dissent contends that the length of the jury selection process in this case has its genesis in the pervasive prejudice permeating through the jury pool. But a jury selection process of several weeks in length is not unusual in either contemporary or historical terms.[14] "[M]ajor cases have been known to require six weeks or more before the jury is seated." David W. Neubauer & Stephen S. Meinhold, Judicial Process: Law, Courts, and Politics in the United States 358 (6th ed. 2013). Despite all the hay the dissent makes of petitioner's eligibility for the death penalty, that reality all but guarantees a longer, more detailed selection process.[15] In fact, the jury selection

---

[14]    Jury selection can sometimes take weeks, particularly in complicated or high-profile cases. See, e.g., Miller-El v. Cockrell, 537 U.S. 322, 328 (2003) (noting that jury selection in capital murder case took five weeks); State v. Addison, 87 A.3d 1, 57 (N.H. 2013) (explaining that jury selection, from "a larger than usual jury pool," took "approximately seventeen days" during which time "over 300 prospective jurors reported to the courthouse for jury selection"); Davis v. State, 611 A.2d 1008, 1010 (Md. Ct. Spec. App. 1992) (noting that in "states such as California and Florida and New York . . . jury selection in celebrity cases may consume three or four weeks"). And, historically, a lengthy jury selection process is nothing novel. See William H. Levit et al., Expediting Voir Dire: An Empirical Study, 44 S. Cal. L. Rev. 916, 923 & n.28 (1971). For example, jury selection for the trial of Black Panther Bobby Seale took thirteen weeks and required the examination of 1550 potential jurors. Id. at 923 n.28. And the murder trial of Charles Manson featured a six week voir dire process. Id.

[15]    See Bill Hawkins, Capital Punishment and the Administration of Justice: A Trial Prosecutor's Perspective, 89 Judicature 258,

-26-

process in this case is perfectly comparable in length with the only other recent capital jury selection processes in the District of Massachusetts. See United States v. Sampson, No. 1:01-cr-10384 (D. Mass.) (seventeen days of jury selection running from September 18, 2003 to October 27, 2003); United States v. Gilbert, No. 3:98-cr-30044 (D. Mass.) (nineteen days of jury selection running from October 16, 2000 through November 17, 2000, provisionally qualifying only approximately two to seven jurors per day).

Moreover, it defies logic to count the efforts the district court has taken to carefully explore, and eliminate, any prejudice as showing the existence of the same.[16] In this case, it is entirely unsurprising that the district court, and the parties, have taken ample time to carefully differentiate between those individual jurors who have been exposed to publicity but are able to put that exposure aside and those who have developed an opinion they cannot put aside. Together, the careful process employed by the district court, including the "face-to-face opportunity to gauge demeanor and credibility," and the "information from the questionnaires regarding jurors' backgrounds, opinions, and sources

---

259 (2006)(noting that, in Texas, selection in counties that often handle death-penalty cases typically takes three weeks, while in locales where the death penalty is a "rare instance" selection "may last much longer").

[16]     The dissent makes the argument that any jury found to be unbiased during voir dire in fact then cannot be "indifferent." This is topsy turvy.

-27-

of news" have afforded the district court "a sturdy foundation to assess fitness for jury service." Skilling, 561 U.S. at 395. We should commend, not decry, district courts' rigorous efforts to ensure defendants are guaranteed a trial commensurate with their Sixth Amendment rights.

Our dissenting colleague also quotes a variety of allegedly "representative" juror responses in an effort to demonstrate that the jury pool is rife with disqualifying prejudice that requires us to doubt the avowals of impartiality from all members of the venire. But the reality of the record is that those comments, selectively plucked from the questionnaire responses or voir dire testimony of over 1,300 jurors, are nothing close to representative.[17] It is a disservice to the judicial system to claim otherwise.

The majority of the quoted statements in the dissent regarding views of Tsarnaev's guilt, and all of the most extreme,

_____

[17] We explain the limited relevance of these statements specific to each category the dissent lists. However, it is worth describing them in the aggregate and mentioning what the dissent does not. Of the thirty-two selective quotations the dissent presents in bullet-point fashion, see Dissenting op. at 48-51, twenty-one come from jurors who were stricken by the district court, or by agreement of the parties, for cause. Eight more come from the questionnaires of jurors whose panels have not yet been individually questioned. Given the results of the voir dire process thus far, nothing in the record suggests that any of those jurors expressing bias will nevertheless be provisionally qualified. Finally, while three quotes do come from the voir dire of two provisionally qualified jurors, taken in the context of those jurors' entire voir dire, there is no indication that those jurors are biased.

come from the questionnaires of jurors who the parties agreed to excuse and were excused without individual questioning. In that sense, the parties and the court have plainly acknowledged that those members of the pool are not representative of the more than 250 pool members who, by contrast, have thus far been called back for individual questioning. Still other quotes involve statements made to potential jurors by acquaintances or coworkers which are hardly probative of the potential juror's own attitudes. In any event, those jurors were never provisionally qualified. They were either not called back for individual voir dire or struck for cause after the district judge was able to assess their demeanor in person. While a single juror has been provisionally qualified among the group whom the dissent discusses as having expressed views on guilt, the full context of his or her mild statement made clear that he or she was able to put aside any initial impressions he or she may hold -- and, we note, the defense also did not object to that juror for cause.[18]

---

[18] The dissent notes, in passing, that one of the provisionally qualified jurors selected on his or her questionnaire that he or she would be "unable" to put aside his or her opinion regarding the defendant's guilt. But the parties expressed no concern about this juror and, any concern that may have been warranted by the juror's initial selection on the questionnaire, was eliminated by voir dire. During questioning the juror evidenced a clear and unequivocal ability to base his or her decision solely on the evidence presented during trial. Indeed, the defense neither asked about this juror's questionnaire answer nor objected to the juror's qualification for cause.

Nor do we think such statements are so common among the pool of excused jurors that a court must infer bias among others who have been provisionally qualified. It is not surprising that in a pool of over a thousand jurors with varying opinions, some will make strong statements that disqualify them from jury service. Others have expressed their ability to be fair and impartial. The honesty of their answers, conscious and subconscious, has been probed by extensive voir dire, as the Supreme Court approved in Skilling.

The putative "personal connections" proffered by the dissent also are mischaracterizations of the record. Many of the connections attributed to prospective jurors are, clearly, attenuated or tangential. And all but two of those quoted come from the questionnaires of jurors whose panels have not yet been questioned. The record gives us no reason to doubt that, like their congeners from the first several panels, those with the closest connections will be struck on the agreement of the parties or by the court for cause. Of the three quotations presented by the dissent that are among the panels already questioned, one juror was not called for individual questioning and the other two were struck for cause following questioning.

Finally, as for the exposure to publicity, we emphasize again that "juror impartiality . . . does not require ignorance." Skilling, 561 U.S. at 381 (emphasis in original). The fact that

many of the jurors have been exposed to some measure of publicity, alone, is not probative of any "pervasive prejudice" in the jury pool. In addition, four of the dissent's nine selective statements are from the statements of a single juror during voir dire; a juror, moreover, who was struck on the government's motion for cause. It is, in any event, black letter law that "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." Dobbert v. Florida, 432 U.S. 282, 303 (1977) (emphasis added). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." Irvin, 366 U.S. at 723.

Ultimately, rather than a voir dire taking a total of five hours, as in Skilling, the voir dire in this case has taken -- appropriately we think -- several weeks. To the extent that the dissent suggests that this lengthy voir dire, and the sentiment it has demonstrated, indicates that a presumption of prejudice exists which cannot be overcome, we disagree. We cannot say that the procedures put in place by the trial judge are either insufficient on their face or so inadequately implemented as to justify an interruption of the process and a change of venue. Nor are we convinced that the results thus far compel such a drastic step.

Indeed, as the district court noted, "the defendant's presentation of a series of selective quotations from the 1300-plus questionnaires is misleading because the quotations are not fairly representative of the content of the questionnaires generally." So too, in the filings before us and in the dissent. In sum, neither the length of the district court's careful selection process nor the sentiments of the venire as a whole provide any basis for concluding, on mandamus, that pervasive prejudice taints the entire jury pool.

D.    **Petitioner Has Not Demonstrated Irreparable Harm**.

Petitioner has not established a clear and indisputable right to relief but we address irreparable injury in any event. The law is designed to prevent use of mandamus to circumvent normal post-trial appellate review, as petitioner attempts here. Cheney, 542 U.S. at 380. In the event that petitioner is convicted on one or more of the charges against him, he will have the right to appeal his conviction and sentence to this court and may raise the venue argument again. That double layer of review is itself a guarantee of due process.[19] For that reason petitioner will not

---

[19]    The dissent's claims to the contrary are confusing and contradictory, to say the least. Despite maintaining throughout his opinion that the decibel of publicity in the Boston area has been much greater, and more consistent, while the coverage nationwide has slowly dwindled, see Dissenting op. at 39-41, 45, 66-67, our dissenting colleague suddenly claims exactly the opposite. He contends that a case of this magnitude will face unique difficulties for retrial elsewhere because any subsequent jury -- presumably one outside of Massachusetts, if any conviction

-32-

suffer irreparable injury nor can he show irreparable injury to the courts.

Petitioner relies heavily on our decision in <u>Bulger</u> to argue that both he and the reputation of the legal system will suffer irreparable injury if he does not prevail on his pretrial petition. <u>Bulger</u> involved a very different question and different standards. There the question was whether a reasonable member of the public <u>might</u> question the <u>judge's</u> ability to preside impartially, due to the nature of his prior employment. <u>In re Bulger</u>, 710 F.3d at 49. No such issue is presented here. In <u>Bulger</u>, as well, the other conditions for mandamus were met. Here, they have not been met.

**E.      The Balance of Equities do not Favor Granting Mandamus.**

Given petitioner's failure to meet the prior two standards, he is not entitled to test the balance of the equities. But even then, the balance of the equities does not favor petitioner, whose arguments insufficiently credit the Constitution's provisions that the trial be held where the crimes were committed. Tsarnaev's peers in the Boston area will constitute the jury. Members of the community will have access to

---

is overturned on venue grounds -- will be "exposed to the daily events of the first trial," "the testimony given by the victims, the witnesses, and the experts," and "all the evidence presented by the government." <u>Dissenting op.</u> at 71. Yet, we are puzzled at how the dissent can conclude such publicity, and irreparable harm, will be produced in locations that, the dissent so vigorously contends pages earlier, have paid far less attention to this case.

the trial and to the court room and spillover courtrooms. The victims and witnesses are located here and will not be forced to undertake the burdens of travel elsewhere. The same is true of those who have known petitioner as a resident and member of the community.

Moreover and most importantly, this Petition requests that we interfere in the careful jury selection process that has been ongoing in the district court, despite the fact that the petitioner remains able to raise claims of lack of an impartial jury on direct appeal. Such direct interference in an ongoing trial matter by an appellate court is inimical to our process of justice and our respect for the reasoned decisions of district court judges. Just as we are unable to conclude that it is clear and indisputable that the petitioner cannot receive a fair trial by an impartial jury in the Eastern Division of Massachusetts, the relevant interests weigh in favor of allowing the jury selection process to continue. And they weigh against taking the unprecedented step of abandoning our "primary reliance on the judgment of the trial court." Skilling, 561 U.S. at 386 (quoting Mu'Min, 500 U.S. at 427) (internal quotation marks omitted).

### III.

The Second Petition for Mandamus is denied.

**-Dissenting Opinion Follows-**

**TORRUELLA, <u>Circuit Judge</u> (Dissenting).** "'[R]egardless of the heinousness of the crime charged, the apparent guilt of the offender[,] or the station in life which he occupies,' our system of justice demands trials that are fair in both appearance and fact." <u>Skilling</u> v. <u>United States</u>, 561 U.S. 358 (2010) (Sotomayor, J., concurring in part and dissenting in part) (quoting <u>Irvin</u> v. <u>Dowd</u>, 366 U.S. 717, 722 (1961)). The actions taken by this court today pave the way for a trial that is fair neither in fact nor in appearance.

The press coverage of this case -- beginning with the bombing itself and the subsequent manhunt culminating with the shelter-in-place order, continuing thereafter with stories of the victims, Boston's coming together and healing as one united city, and the coverage of the pretrial events -- is unparalleled in American legal history. Given the impact of the bombing and subsequent press coverage on the entire city, it is absurd to suggest that Tsarnaev will receive a fair and impartial trial in the Eastern Division of the District of Massachusetts. There is no sound basis for refusing to apply a presumption of prejudice to a high-profile, omnipresent, emotionally-charged case like this -- particularly where the entire Boston community has been terrorized, victimized, and brutalized by such a horrendous act of violence. No amount of <u>voir dire</u> can overcome this pervasive prejudice, no matter how carefully it is conducted.

The whole world is watching to see how the American legal system treats Tsarnaev, even if he is allegedly the most dreadful of defendants. Every move taken is scrutinized to see if the bedrock American rights of "innocent until proven guilty" and the "right to a fair trial by an impartial jury" are given to a foreign-born defendant accused of terrorism -- among the most heinous of crimes. Unfortunately, both the district court and majority fail to uphold these rights, and this failure damages the credibility of the American judicial system.

I do not dispute that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." Kerr v. U.S. Dist. Court for N. Dist. of Cal., 426 U.S. 394, 402 (1976). But in my forty years on the bench, both as a trial judge and as an appellate judge, I am unaware of a situation more "extraordinary" than this one. The district court has demonstrated a clear abuse of discretion. Contrary to the district court's assessment and the decision of the majority today, mandamus relief is not only appropriate, but also necessary to assure that Tsarnaev receives the fair trial that is mandated by our Constitution. Therefore, for the reasons explained herein, I respectfully -- but vehemently -- dissent.

# I.  <u>Background</u>[20]

On April 15, 2013, two bombs exploded near the finish line of the Boston Marathon on Boylston Street in downtown Boston. Three people were killed and approximately 264 others were injured. Countless others ran from the scene in terror.  Over the next four days, a massive manhunt for those responsible ensued.  On the third day, April 18, authorities released video surveillance and photos of the suspects: Tamerlan and Dzhokhar Tsarnaev.  That night, while the brothers were trying to flee Boston, they allegedly carjacked an SUV and killed an MIT police officer.  In a subsequent shootout with police, Tamerlan Tsarnaev was seriously injured.  Dzhokhar Tsarnaev (hereinafter, "Tsarnaev") was able to temporarily escape, in part by allegedly driving over his brother.

Finally, on April 19, the search had narrowed to the Boston suburb of Watertown.  In an unprecedented move, authorities called for a "shelter-in-place" advisory, effectively placing the city in lockdown: residents in Watertown and the surrounding areas -- Boston proper, Cambridge, Newton, Belmont, and Waltham -- were ordered not to leave their homes.  The T (Boston's public transportation system) was shut down, as were most businesses and

---

[20]  This section contains a brief summary of the events surrounding the bombing and subsequent manhunt.  For a minute-by-minute recap of those four days, see Sara Morrison and Ellen O'Leary, <u>Timeline of Boston Marathon Bombing Events</u>, Boston.com (Jan. 5, 2015), http://www.boston.com/news/local/massachusetts/2015/01/05/timeline-boston-marathon-bombing-events/qiYJmANm6DYxqsusVq66yK/story.html.

public offices.  While residents were confined to their homes, FBI agents, local police officers, and SWAT team members went door-to-door in a twenty-block radius of Watertown searching for Tsarnaev. Hours later, he was found hiding in a boat in a resident's backyard.  Tsarnaev was bloodied from a firefight with authorities and had written a note on the boat claiming that "[w]hen you attack one Muslim, you attack all Muslims" and that the Marathon victims were collateral damage.[21]  Immediately upon his arrest, Boston Mayor Thomas Menino tweeted "We got him"; the Boston Police Department tweeted "CAPTURED!!!  The hunt is over.  The search is done.  The terror is over.  And justice has won."[22]  Meanwhile, Watertown residents "flooded the streets, cheering every passing police car and armored vehicle in an impromptu parade" and residents "danced in the streets outside Fenway Park."[23]

Most -- if not all -- of this four-day ordeal was shown live on television and reported real-time on the internet.  Print

---

[21]  Maria Cramer & Peter Schworm, Note May Offer Details on Bomb Motive, Boston Globe, May 16, 2013, http://www.bostonglobe.com/metro/2013/05/16/sources-bomb-suspect-dzhokhar-tsarnaev-took-responsibility-for-marathon-attacks-note-scrawled-boat/UhBOmEByeWVxGd1RAxz0tO/story.html.

[22]  See "We got him!": Boston Bombing Suspect Captured Alive, NBC News (Apr. 19, 2013), http://usnews.nbcnews.com/_news/2013/04/20/17823265-we-got-him-boston-bombing-suspect-captured-alive?lite.

[23]  Id.

newspapers, meanwhile, published daily recaps of the previous day's events, including the pictures of a bloodied Tsarnaev.[24]

Over the next few weeks, nationwide coverage continued, slowly dwindled, and, with the exception of the occasional story here-and-there, eventually ended. In Massachusetts, however, the story did not end. Instead, the local news (both television and print) continued to cover all the details of the bombing and its aftermath. The reporting focused not only on Tsarnaev, but on the city as a whole. Coverage included stories of the victims and their family and friends, those who bravely risked their lives to help the victims, and how the entire community came together.[25]

_____

[24] See, e.g., Live Blog: Bombings at the Boston Marathon, http://live.boston.com/Event/Live_blog_Explosion_in_Copley_Square ?Page=0 (last visited Feb. 20, 2015); Boston Bombing Manhunt: Watch the Live Streaming Video, Inquisitir (Apr. 19, 2013), http://www.inquisitr.com/625705/boston-bombing-manhunt-watch-the-live-streaming-video/ ("Developments in this active and intense search are rapidly unfolding minute by minute. Live feeds to the local television media coverage of the Boston bombing manhunt are embedded below."); Boston Transit Shut Down, Nearly 1 Million Sheltering in Place amid Terror Hunt, NBC News (Apr. 19, 2013), http://usnews.nbcnews.com/_news/2013/04/19/17822687-boston-transi t-shut-down-nearly-1-million-sheltering-in-place-amid-terror-hunt ?lite (embedding a video with the caption "Video of firefight between suspects and police").

[25] See, e.g., Eric Moskowitz, Long After Marathon Blasts, Survivor Loses Leg, Boston Globe, Nov. 11, 2014, http://www.bostonglobe.com/ metro/2014/11/11/long-after-marathon-bombings-survivor-loses-leg/urutULO5K3H33jlOGoLiNI/story.html; Boston Marathon Bombings - One Year Later, Boston Globe, http://www.bostonglobe.com/metro/ specials/boston-marathon-bombings-year-later (last visited Feb. 20, 2015) (detailing numerous stories about the city's recovery and the victims over the year since the marathon); Bella English & Sarah Schweitzer, Some Affected by Bombing Will Be at Race, but Others Won't, Boston Globe, Mar. 30, 2014, http://www.bostonglobe.com/

This phenomenon and sentiment were embodied in the "Boston Strong" campaign which "rallied a city," became "shorthand for defiance, solidarity, and caring," and "present[ed] a unified front in the face of [a] threat."[26]  Indeed, one could not go anywhere in Boston in the bombing's aftermath without seeing the slogan on a car, t-shirt, bracelet, tattoo, or even mowed into the outfield of Fenway Park.  It spurred concerts, fundraisers, and rallies throughout the city.  A website, onefundboston.org, was also formed "with the purpose of helping those most affected by the tragic Boston Marathon bombings" by raising money and providing a forum to "gather[] encouraging stories of strength, recovery, and hope from survivors."

These stories and the "Boston Strong" campaign continue to this day, almost two years later.  Just over four weeks ago, as Boston was slammed with a massive blizzard leaving approximately two feet of snow, a man took it upon himself to shovel the finish line of the Marathon.  This man was referred to by many in the community as a "hero" and a "snowmaritan," and led to the viral

---

metro/2014/03/29/marathon-victims-ponder-returning-marathon/SkxPd 1RkvCHZp5YDweJ64K/story.html; Jaclyn Reiss, Unease Lingers a Year After Manhunt, Boston Globe, Mar. 9, 2014, http://www.bostonglobe .com/metro/regionals/west/2014/03/09/watertown-residents-question -police-tactics-manhunt-for-bombing-suspects/V2cAugxzqcNvlsP82pLZ 2L/story.html.

[26]  Ben Zimmer, "Boston Strong," the Phrase that Rallied a City, Boston Globe, May 12, 2013, http://www.bostonglobe.com/ideas/ 2013/05/11/boston-strong-phrase-that-rallied-city/uNPFaI8Mv4QxsWq pjXBOQO/story.html.

"#WhoShoveledTheFinishLine" hashtag on social media.[27] And as this case has proceeded, a dump truck has parked outside the courthouse bearing a "Boston Strong" logo and a building currently being constructed across the street from the courthouse has hung a "Boston Strong" banner.

There is no doubt that Boston has, quite laudably, emerged from this attack stronger and more united than it was before. However, these events also show that Boston has not yet fully recovered, and that every resident -- whether or not they were at the marathon that day, knew a victim, or were subject to the shelter-in-place order[28] – was deeply and personally affected by the tragedy.

We are now tasked with deciding whether the effects of these tragic events and the unrelenting media coverage that followed and continues to this day have affected Tsarnaev's constitutional right to a trial by a jury that is fair, impartial, and indifferent, and if so, whether we should apply our mandamus power to intervene.

----

[27] See, e.g., Twitter Chatter, UPDATE: The Man Who Shoveled the Marathon Finish Line Has Been Found, BDCwire (Jan. 28, 2015), http://www.bdcwire.com/who-shoveled-the-marathon-finish-line/.

[28] Indeed, some even thought April 19, the day of the shelter-in-place order, was "so much scarier" than April 15, the day of the bombing itself. See Alan GreenBlatt, Boston on Lockdown: "Today Is So Much Scarier", (Apr. 19, 2013), http://www.npr.org/blogs/thetwo-way/2013/04/19/177934915/The-Scene-In-Boston-Today-Is-So-Much-Scarier (quoting a resident).

## II. Discussion

Courts throughout the country have found mandamus to be an appropriate, albeit rarely implemented, vehicle to challenge a district court's change-of-venue decision. See, e.g., In re Volkswagen of Am., Inc., 545 F.3d 304, 308-09; (5th Cir. 2008); Matter of Balsimo, 68 F.3d 185, 187 (7th Cir. 1995); In re Briscoe, 976 F.2d 1425, 1429 (D.C. Cir. 1992); United States v. McManus, 535 F.2d 460, 464 (8th Cir. 1976).[29] As in all mandamus cases, a petitioner must establish the following before the writ will issue: (1) that his "'right to issuance of the writ is clear and indisputable'"; (2) that he "has no other adequate source of relief; that is, he must show 'irreparable harm'"; and (3) that "on balance, the equities favor issuance of the writ." In re Bulger, 710 F.3d 42, 45 (1st Cir. 2013) (quoting Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 381 (2004) and In re Vázquez-Botet, 464 F.3d 54, 57 (1st Cir. 2006), respectively). Tsarnaev is the rare litigant who has satisfied all three requirements.

---

[29] These cases involved either Rule 21(b) of the Federal Rules of Criminal Procedure or 28 U.S.C. § 1404(a). While the present petition invokes Rule 21(a), this distinction is irrelevant. All three provisions involve a request to change venue. If mandamus is appropriate for convenience purposes, or in the civil context, it must surely be available when the change of venue is due to a prejudiced jury, where the constitutional implications are magnified. In fact, the government conceded at the hearing that if a presumption of prejudice was established, and the district court still refused to transfer venue, then mandamus relief would be appropriate, assuming the other mandamus factors were satisfied.

## A.  Tsarnaev Is Entitled to a Change of Venue

While Article III of the Constitution provides that criminal trials "shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, that requirement is far from absolute.  The Sixth Amendment requires that the trial take place "by an impartial jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI (emphasis added), and the Fifth Amendment's Due Process Clause requires fundamental fairness in trials, see U.S. Const. amend. V.  See also Skilling, 561 U.S. at 378-79; United States v. McVeigh, 918 F. Supp. 1467, 1469 (W.D. Okla. 1996).  To that end, Rule 21 of the Federal Rules of Criminal Procedure requires that a "court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

### 1.  A Presumption of Prejudice Exists Which Cannot Be Overcome

"In determining whether sufficient prejudice exist[s] to require a change of venue, we must conduct two inquiries: 1) whether jury prejudice should be presumed given the facts before us; or 2) if prejudice should not be presumed, whether the jury was actually prejudiced."  United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990).  Here we are dealing with the first inquiry.

There are two ways in which prejudice can be presumed. First, "prejudice may properly be presumed where 'prejudicial, inflammatory publicity about [a] case so saturated the community from which [the defendant's] jury was drawn as to render it virtually impossible to obtain an impartial jury.'" Id. (quoting United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984) (alterations in the original). The publicity "must be both extensive and sensational in nature." Id. Second, it can also be shown when "so many jurors admit to a disqualifying prejudice that the trial court may legitimately doubt the avowals of impartiality made by the remaining jurors." United States v. Rodríguez-Cardona, 924 F.2d 1148, 1158 (1st Cir. 1991). When prejudice is presumed, "no inquiry need be made as to the actual effect of the publicity on the petit jury." United States v. Brien, 617 F.2d 299, 313 (1st Cir. 1980) (citing Sheppard v. Maxwell, 384 U.S. 333, 352-55 (1966)). Regardless of which route is taken, Tsarnaev has established a presumption of prejudice.

As to the first, there is little doubt in my mind that the pretrial publicity -- which has been pervasive, prejudicial, and inflammatory -- has so saturated the Eastern Division of the District of Massachusetts and persists to this day such that we must presume Tsarnaev cannot obtain a fair and impartial trial

here. As explained above, the city of Boston[30] was itself victimized, and the coverage of the attacks and the ensuing manhunt was shown live on television and the internet for four days. I expect most people were following it intently, especially those in Boston and Watertown who were locked in their homes unable to do much else. The spectacle of seeing a bloodied Tsarnaev taken out of the boat and arrested is not something a potential juror in the Eastern Division of the District of Massachusetts can easily forget or put aside; nor can one easily forget Tsarnaev's subsequently released alleged "confession," claiming that all of the victims were collateral damage. These images, which may have been shown once or twice nationwide, were shown repeatedly in Massachusetts.[31] As the Supreme Court acknowledged in Rideau v. Louisiana, "[f]or anyone who has ever watched television[,] the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense" was the actual trial. 373 U.S. 723, 726 (1963) (finding change of venue was required where a

---

[30] When I refer to Boston, I am referring not only to the city of Boston but also to the surrounding neighborhoods and suburbs which make up the greater Boston metropolitan area and from which the jury pool is being drawn.

[31] See, e.g., The Associated Press, Marathon Bombing Aftermath Was Top Massachusetts Story of 2014, MassLive (Dec. 26, 2014), http://www.masslive.com/news/index.ssf/2014/12/marathon_bombing_aftermath_was.html ("The legal aftermath of the Boston Marathon attacks dominated headlines in Massachusetts in 2014, much as the attack itself did last year and the accused bomber's trial surely will in 2015.").

twenty minute jail house "interview" was aired on television for three consecutive days).  For the people of the Eastern Division of the District of Massachusetts, "a community so pervasively exposed to such a spectacle," "[a]ny subsequent court proceedings . . . could be but a hollow formality."  Id.; see also Irvin, 366 U.S. at 719-20 (requiring change of venue where six murders were "extensively covered by news media in the locality, aroused great excitement and indignation" in the area, and involved "officials issu[ing] press releases, which were intensively publicized, stating that the petitioner had confessed"); Brien, 617 F.2d at 313 (transferring one defendant to Springfield, Massachusetts and another to Arizona in a mail and wire fraud case where most investors lost everything because the "sensational activities of [the defendant corporation] precipitated extensive critical comment in the press in New England and the Eastern seaboard" and "the possible effect of that publicity on the defendants' right to a fair trial" required a change of venue).  This is especially true here, where the vast majority of the prospective jurors have personal connections to the events.

One reaches the same conclusion under the second analytical route, which involves examining the jury selection to date.  "[T]he 'length to which the trial court must go in order to select jurors who appear to be impartial'" can also "support a presumption of prejudice."  Angiulo, 897 F.2d at 1181 (quoting

Murphy v. Florida, 421 U.S. 794, 802 (1975)).  Here, the district court summonsed 1,373 jurors and required them to fill out a 101-question questionnaire which explored, among other things: their backgrounds; their personal connections to Boston, the Marathon, the bombings, and the victims; their views on Tsarnaev's innocence; and their views on the death penalty.  These prospective jurors were divided into six jury panels and, assuming they were not struck for cause based solely on the questionnaires, were then subject to individual voir dire by the district court and the parties.  On Wednesday, February 25, 2015, the twenty-fourth day of jury selection, seventy-five jurors were provisionally qualified.[32] The reason for this lengthy process is the pervasive prejudice permeating throughout the pool.  To get a sense of the kinds of views that are representative of both the jury pool and the community, I include below a mere sample of the comments that have been made by prospective jurors, broken into three categories -- the prospective jurors' views on Tsarnaev's guilt, their personal connections to the bombings, and their exposure to publicity about the case:

---

[32]  Because this is a death penalty case, each party has been allotted twenty-three peremptory challenges.  Thus, to seat the twelve jurors and six alternates, sixty-four jurors need to be qualified.  The district court, however, has opted to qualify more than the necessary sixty-four "to be safe."

### Prospective Jurors' Views on Tsarnaev's Guilt

- "[H]ow could I possibly find the defendant not guilty with all the news information. I have trouble accepting him getting housing & living assistance from the state of MA, education without paying, taking the oath of citizenship and then committing crimes against innocent everyday people who are also citizens of USA. Not to mention taxpayers['] $$$"

- "He does not deserve a trial."

- "Caught redhanded should not waste the $ on the trial."

- "[T]hey shouldn't waste the bulits [sic] or poison; hang them."

- "[W]e all know he's guilty so quit wasting everybody's time with a jury and string him up."

- "People told me the defendant is overwhelmingly guilty."

- "[M]ost commented on the fact that we should skip the trial & go right to sentencing b/c of the assumed guilt of the heinous crimes that he's accused of."

- "[It's] hard to understand how someone can defend a murderer."

- "I have formed the opinion that a convicted terrorist should receive the death penalty. They're the enemy of my country."

- "Yeah, I think when I first checked the guilty [box], you know, if I felt that he was guilty box, I realized after, I don't know what all the charges are, so I can't know that he's guilty, because I don't know what the charges are or what the evidence is and all of that. But I think that there's involvement. There was so much media coverage, even just the shootout in Watertown. I watched it on TV. And so I feel like there's involvement there, like I think it's -- anybody would think that."

- The juror's knowledge of graphic pictures, "especially the little boy," would affect the juror's ability to serve because the juror "ha[s] a son."

- "I truly believe that in a sense that [the death penalty] could be the easy way out for the defendant. He could may [sic] want that. So that's why I said that. But as far as this next part, again, at the time I said -- I thought about it a lot since I did this questionnaire. I don't know if I would be able to say he's not guilty. I think, no matter what, he's guilty, no matter what. As far as the death penalty, though, I still -- I wouldn't have an issue, you know, agreeing to the death penalty, but, yeah, it's the easy-way-out thing. I'm not sure. that's the main thing for me."

- "[F]or this case I think a public execution would be appropriate, preferably by bomb at the finish line of the marathon."

- When the prospective juror's coworkers heard she might be picked for this trial, "[t]hey basically said, 'Fry him.'"

- "I haven't heard both sides of the story, but on the other side, I'm supposed to hear the not guilty side louder first than the guilty side. So I guess I should be going in with an assumption of not guilty, but I'm not."

## Prospective Jurors' Personal Connections to the Bombings

- "You don't [sic] want to know [what I thought when I received my summons]! I have close friends that work the emergency room at MA General! What I really thought? We give you home, money eduat [sic] & this is how you pay us back? I'm sorry I'm all for the death penity [sic] on this -- my friends still have nightmare [sic] of that day!"

- "I think we all were effected [sic] by the death of that little boy (Martin) from Dorchester."

- "It does [affect my ability to be fair and impartial]. The Boston Strong bumper sticker . . . represents to me the way the city came together and helped, and just show[s] the unity of Boston. . . ."

- "We know many people that ran and watched the marathon that day so it was always being discussed."

- "I knew 11 people running that day."

- "I feel anyone near the Boston area was effected [sic] by this event."

- "My children were horrified, and even when we thought things were under control, we went into lock-down. It was a horrible week of fear, anger, confusion that we lived through."

- One prospective juror could not put aside a belief that Tsarnaev was guilty because a close friend who was at the Marathon's finish line has had to undergo "multiple surgeries" to her leg due to shrapnel from one of the bombs.

**Prospective Jurors' Exposure to Publicity About the Case**

- "Well, I read the paper every day, and I watch the news two hours every day. So over the course of the past year, I've obviously seen and read and heard quite a bit."

- "My husband and I watched the events on TV [live], including lockdown and capture -- it was very upsetting, traumatizing, made you feel not safe in your own 'back yard.'"

- "It's kind of like saying erase everything you have in your head from something. I don't know that I would be able to erase my memory of everything that I've read, seen, and heard."

- "Absolutely. How could you not [have followed events during the week of the bombing]."

- "I remember seeing some raw footage that day which I'll never forget. Yeah, there was a lot

going on that day, and it really struck me deeply."

- "Well, I mean, from seeing and seeing all the evidence that was publicly available, you know, and the having all the casualty that occurred during that, yes, I feel that he is guilty, and I think the punishment should be, you know, death, because personally I think that this is something that -- I feel takes a greater weight as 9/11, you know, where there were so many lives affected, you know, with, you know, legs or whatnot, you know, that they live every single day now. . . ."

- "I think there's a lot [of concern about the media arrangement], there were questions and there's a lot of conversation, and if you were a potential juror, you'd need to be avoiding the media, and it's so front and center, it's difficult. And, you know, just even driving in the car, the news comes on, and, you know, I've heard, you know, you try to switch it, but you hear things. . . ."

- "In terms of the feelings on guilt, I think that just comes from the initial things in the news when the event happened and seeing all that. So that's kind of formed that perspective."

- "Actually, I think I could be fair, but I do have this image in my mind that I can't deny, to be perfectly honest. . . . The image of him putting the backpack behind that little boy."

After reading these comments, it is clear to me that the jury pool is not composed of unbiased, indifferent individuals.[33]

---

[33] The majority accuses Tsarnaev, and me, of choosing "selective quotations" which are "misleading," <u>ante</u>, at 32. It also notes that its "own review of those materials shows that the district court is in fact identifying provisionally qualified jurors with no or few and, at most, attenuated claimed connections to the bombings." <u>ante</u>, at 16. Yet, of the seventy-five provisionally qualified jurors, forty-two self-identified as having some connection to the events, people, and/or places at issue. And

This should come as no surprise -- the attitudes of the jury pool, as evidenced by statements like those excerpted above, reflect the understandable and altogether human reaction of neighbors traumatized by the horrific violence inflicted upon them and their entire community. Indeed, in no small part and in very real terms, the members of the jury pool were themselves victims of the perpetrators' chilling act of terror. Acknowledging that fact is by no means an indictment of the jury pool or the people of Boston, who have shown such courage and resilience in the face of tragedy and terror. While we may thus understand and empathize with the prospective jurors' reaction, such empathy and understanding cannot convert a biased jury pool into a constitutionally impartial jury of Tsarnaev's peers. Rather, our duty as honest arbiters requires us to uphold the Constitution and to ensure that those strong feelings shared by the greater Boston community do not deny Tsarnaev his right to a fair trial. If the particular facts and circumstances of this case -- together with the emotionally-charged comments of the jury pool excerpted above -- do not establish a presumption of prejudice, it is hard to fathom what would.

This prejudice is only highlighted and magnified by the surroundings in which jury selection is occurring. Each day, when jurors report to the John Joseph Moakley United States Courthouse,

twenty-three stated in their questionnaires that they had formed the opinion that Tsarnaev is guilty; of those twenty-three, one even stated that he would be unable to set that belief aside.

they cannot help but observe an overwhelming display of official government force. A secure perimeter has been established for several blocks in each direction of the Courthouse; authorized vehicles may be admitted, but only after first being inspected by bomb-sniffing dogs. Anyone who makes it past the perimeter must then navigate crowd-control barriers, only to then be greeted by a phalanx of armed Federal Protective Service officers standing guard at the entrance to the Courthouse. Meanwhile, the roads are lined with Boston Police cars, Department of Homeland Security vans, and vehicles from the U.S. Marshals Service. Upon entering the Courthouse, if one looks out past the garden to the Inner Harbor, one sees that at least two U.S. Coast Guard "Defender" Class Small Response Boats, each armed with a high caliber machine gun, are patrolling the waters behind the Courthouse.

It likely goes without saying that much of this security dissipates when Tsarnaev is not in court. While I cannot evaluate whether such security is actually necessary or reasonable, the impression it gives off is clear: the proceedings in this case are taking place in a fortress-like atmosphere because Tsarnaev must be extraordinarily dangerous. As a result, prospective jurors are inundated with the message that Tsarnaev is a threat who requires the full force of the U.S. Military and civilian security apparatus in response. I do not fault the many security personnel for doing their duty; nor do I fault their superiors for taking precautions

regarding the security of the court.  Still, I am troubled by how such a conspicuous show of force outside the Courthouse may influence the proceedings within it, especially to a jury pool already so deeply affected by the events.  Many of those previously traumatized by the shelter-in-place order and area-wide manhunt might understandably relive that trauma when triggered by such a similar show of force.  This is especially true considering the Marathon's finish line is only mere miles from the situs of the these proceedings and that the two-year anniversary of the bombing will take place in the middle of Tsarnaev's trial.

The government, district court, and majority see things differently.  In rejecting Tsarnaev's third motion for a change of venue, it points to the jurors already qualified, concluding that the initial questionnaires and individual <u>voir dire</u> have done their job to effectively weed out prejudiced jurors and allow the court to find impartial jurors.  But, under these unique circumstances, it strains credulity to assume that mere questionnaires and <u>voir dire</u> can effectively weed out biased residents and find seventy-five qualified jurors who are impartial and indifferent.  As the Supreme Court explained in <u>Irvin</u>:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father.  Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.  As

one of the jurors put it, "You can't forget what you hear and see."[34]

366 U.S. at 728. The District Court for the Western District of Oklahoma made a similar point in McVeigh:

> The existence of . . . prejudice is difficult to prove. Indeed it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence.

918 F. Supp. at 1472. We echoed that sentiment in Angiulo:

> Where a high percentage of the venire admits to a disqualifying prejudice, a court may properly question the remaining jurors' avowals of impartiality, and choose to presume prejudice.

897 F.2d at 1181-82. Indeed, in comparable cases of such severe and pervasive prejudice, the Supreme Court found that there was no need "to examine a particularized transcript of the voir dire examination of the members of the jury." Rideau, 373 U.S. at 727; cf. United States v. Moreno Morales, 815 F.2d 725, 735 (1st Cir. 1987) (finding no presumption of prejudice where twenty-five percent of the venire admitted believing that the defendants were guilty).

Finally, even if it were possible to overcome the presumption of prejudice and find truly impartial and unbiased

_____

[34] Indeed, that is precisely what one prospective juror in this case said during voir dire: "I can't unforget what I already know."

-55-

jurors, these jurors would certainly not be "indifferent," as almost every prospective juror has some connection to the events. See Irvin, 366 U.S. at 722 ("The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). Nor would they be representative of either the jury pool as a whole or the community at-large. See id. at 727 ("Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box. . . . With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." (internal citations omitted)).

There is no doubt in my mind that the circumstances surrounding this case -- which, it cannot be emphasized enough, is a death penalty case -- create a presumption of prejudice. I have seen nothing in either the questionnaires or the voir dire to suggest otherwise. Indeed, the government is unable to point to a single instance in any of the 463 criminal jury cases heard in this Circuit (188 of which were in the District of Massachusetts) in the past five years where statements made during jury selection came even close to approximating the quite understandable level of bias,

hate, disgust, and outrage manifested by so many of the prospective jurors here. For all these reasons, the district court's decision to thrice deny Tsarnaev's motion for a change of venue is a clear abuse of discretion.

### 2. **This Case Is Comparable to *McVeigh*, *Rideau*, and *Irvin***

It is extremely disappointing that both the district court and the majority fail to appreciate the similarities to United States v. McVeigh, 918 F. Supp. 1467 (W.D. Okla. 1996), and the other cases cited by Tsarnaev. McVeigh concerned the trial of those responsible for the Oklahoma City bombing which killed 168 people, injured hundreds more, completely destroyed the Alfred P. Murrah Federal Office Building, and damaged many other buildings, including the federal courthouse. Id. at 1469. In McVeigh, the parties agreed that venue had to be moved outside of Oklahoma City because "[t]he effects of the explosion on that community are so profound and pervasive."[35] Id. at 1470. The dispute was over whether to keep the trial in Oklahoma, specifically Tulsa, or to move it to Denver. Id. at 1470, 1474.

---

[35] The argument advanced by the government distinguishing McVeigh on the grounds that the trial had to be moved because of the damage to the courthouse is disingenuous. A simple reading of the opinion makes clear that while the courthouse was damaged, that was not the reason for the venue change. Moreover, the contention that McVeigh is different because in that case the parties agreed the trial should not occur in Oklahoma City only supports the argument that trial in Boston is inappropriate. With almost identical facts, the government and the district court judge in McVeigh acknowledged on their own accord that a trial in Oklahoma City would be fundamentally and unconstitutionally unfair.

-57-

The court concluded "that there is so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in that state." Id. at 1474 (emphasis added). Specifically, the district court relied on the following factors. First, while initially there was "extremely comprehensive" national media coverage, "[a]s time passed, differences developed in both the volume and focus of the media coverage in Oklahoma compared with local coverage outside of Oklahoma and with national news coverage." Id. at 1470-71. While national coverage dwindled, local coverage continued for months after the explosion and focused on "more personal" coverage "of the victims and their families" and of "individual stories of grief and recovery." Id. at 1471. Second, "Oklahomans [were] united as a family with a spirit unique to the state. Indeed, the 'Oklahoma family' ha[d] been a common theme in the Oklahoma media coverage, with numerous reports of how the explosion shook the entire state, and how the state ha[d] pulled together in response." Id. Third, "[t]he possible prejudicial impact of this type of publicity [wa]s not something measurable by any objective standards." Id. at 1473.

These considerations are identical to those in the present case.[36] As described above, the ongoing Massachusetts

_____

[36] The only real difference between the two cases is that Tsarnaev, though a naturalized citizen, is foreign-born and may have been influenced by overseas terrorist organizations while McVeigh is

coverage has been significantly more in-depth and personal than the national coverage which has, for the most part, been sporadic and general. Moreover, like the "Oklahoma Family" slogan, "Boston Strong" has taken hold (and continues to be used) throughout Massachusetts.[37] And, as the media reports, juror questionnaires, and <u>voir dire</u> make clear, there is strong prejudice amongst prospective jurors, the full extent of which is almost impossible to gauge.

Four other cases are also worth mentioning. In <u>Rideau</u> v. <u>Louisiana</u>, 373 U.S. 723 (1963), the defendant was arrested and charged with bank robbery, kidnapping, and murder. <u>Id.</u> at 724. Following his arrest, he was "interviewed" by the country sheriff and allegedly admitted his guilt. <u>Id.</u> For three consecutive days, the recording of this "interview" was broadcast on television and was seen by an estimated 97,000 people (or approximately 65% of the

---

often referred to as a "home-grown" terrorist. Given that distinguishing the two cases on the basis of national origin would likely be constitutionally impermissible, we must presume that the government and district court are relying on some other, unnamed distinction. However, they have failed to present another persuasive, material distinction between the two cases, and I can find none.

[37] The majority's contention that the Boston Strong theme is irrelevant because it "is about civic resilience and recovery" and "is not about whether petitioner is guilty or not" or whether a prospective juror "could not be fair and impartial," <u>ante</u>, at 25, n.13, is struthious. The very fact that a prospective juror needs to express "resilience" and "recovery" is eloquent evidence that he or she was affected by the events.

Calcasieu Parish).  Id.  In reversing the defendant's conviction,

the Supreme Court explained that

> it was a denial of due process of law to
> refuse the request for a change of venue,
> after the people of Calcasieu Parish had been
> exposed repeatedly and in depth to the
> spectacle of Rideau personally confessing in
> detail . . . .  For anyone who has ever
> watched television the conclusion cannot be
> avoided that this spectacle, to the tens of
> thousands of people who saw and heard it, in a
> very real sense was Rideau's trial.

Id. at 726.  The repeatedly broadcast image of Tsarnaev being taken

from a boat, covered in blood from a firefight with police -- an

image  which was quite likely seen by nearly 100% of the Eastern

Division of the District of Massachusetts population[38] -- is just

as damaging a "confession" and spectacle, particularly when paired

with the incriminating and incendiary statements allegedly written

by him in the boat.

Similarly, in Irvin v. Dowd, 366 U.S. 717 (1961), the

defendant was charged with murdering six individuals near

Evansville, Indiana in a four-month span.  Id. at 719.  Shortly

after his arrest, "officials issued press releases, which were

---

[38]  The majority contends that this is a "remarkable statement"
which is "completely unfounded," ante, at 22, n.10.  But "'common
sense should not be left at the courthouse door.'"  District of
Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 135 n.3
(1992) (Stevens, J., dissenting) (quoting Schultz v. Nat'l Coal. of
Hispanic Mental Health & Human Servs. Orgs., 678 F. Supp. 936, 938
(D.D.C. 1988)).  Indeed, 94% of potential jurors who filled out a
questionnaire stated that they had been exposed to "moderate" or "a
lot" of publicity.  To suggest that this exposure did not include
the bloodied image of Tsarnaev belies common sense.

intensively publicized, stating that the petitioner had confessed to the six murders."[39]  Id. at 719-20.  In requiring a change of venue, the Supreme Court noted that the "build-up of prejudice is clear and convincing."  Id. at 725.  It pointed to the "then current community pattern of thought" and the "curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive," which were solicited and broadcast over local stations.  Id.  The tweets by Mayor Menino and the Boston Police Department, the opinions expressed in the local media, the surveys of Massachusetts residents as to their views on the case, and the prospective jurors' comments (some of which are detailed above) are analogous to the same kind of prejudicial actions found to be impermissible when they occurred in Evansville in connection with Irvin.[40]

---

[39]  The majority places too much emphasis on the fact that "95% of the dwellings in Gibson County" received the local newspapers carrying the prejudicial information, Irvin, 366 U.S. at 725, whereas the subscription rates for the local newspapers in the Eastern Division of the District of Massachusetts are significantly lower.  In today's media-saturated environment, physical newspapers are obviously not the sole source of news and information. Instead, people receive their information from a wide variety of sources -- newspapers, local news broadcasts, twenty-four-hour cable television, the Internet, etc.  Indeed, many people access the newspaper online, which in many cases obviates the need for a subscription.

[40]  Contrary to the majority's implications, recent Supreme Court caselaw has not cast doubt on Irvin.  The main case the majority relies on, Patton v. Yount, 1467 U.S. 1025 (1984), is readily distinguishable on its facts.  Yount involved the publicity surrounding a retrial which was "greatly diminished" due to the "lapse in time" between the events and the second trial.  Id. at

Finally, venue challenges were raised in the state court trials of both Lee Boyd Malvo and John Allen Muhammad -- better known as the Beltway Snipers who terrorized Virginia, Maryland, and Washington, D.C. in late 2002. Though the procedural postures and media coverage are not identical to the present case, it is telling that their trials were moved over 200 miles away from the site of the attacks to ensure they, too, would receive fair trials.[41]

In all of these cases, each involving the death penalty and three involving similar acts of terrorism,[42] a change of venue

---

1032, 1033. Moreover, the "community sentiment had softened" from the "extensive adverse publicity and the community's sense of outrage [which] were at their height prior to Yount's first trial in 1966." Id. That the Supreme Court ruled that the facts in a subsequent case did not warrant a change of venue is a far cry from suggesting that Irvin is no longer good law. Irvin has not been overruled, either explicitly or implicitly. If it had, it would be quite odd for Justice Sotomayor to rely on it so heavily in her Skilling dissent. Thus, Irvin still provides valuable and on-point precedent.

[41] See, e.g., Lloyd Vries, 2nd Sniper Trial Venue Changed, CBS News (July 24, 2003), http://www.cbsnews.com/news/2nd-sniper-trial-venue-changed/ ("The trial of sniper suspect John Allen Muhammad will be moved 200 miles from Prince William County to Virginia Beach, a judge ruled Wednesday. Circuit Judge LeRoy Millette said it 'has been clearly shown that such a change of venue is necessary to ensure a fair and impartial jury."); Stephen Braun, Judge Changes Sniper Trial Venue, L.A. Times, July 3, 2003, http://articles.latimes.com/2003/jul/03/nation/na-sniper3 ("Citing concerns that pretrial publicity would make it impossible to select an impartial jury, a Virginia judge Wednesday ordered the Washington-area serial sniper murder trial of Lee Boyd Malvo moved 200 miles south of the capital suburbs.").

[42] The majority cites to cases involving the 1993 World Trade Center bombing to suggest that high-profile terrorism cases can be tried in the district where the crime occurred. See United States v. Yousef, No. S12 93 Cr. 180(KTD), 1997 WL 411596, at *3 (S.D.N.Y.

was abundantly appropriate.  It is likewise appropriate here.  The district court's failure to transfer is a clear abuse of discretion.

### 3.  **This Case Is Not Comparable to *Skilling***

The government, district court, and majority, however, all disagree and equate this case to United States v. Skilling, 561 U.S. 358 (2010).  This comparison is inapposite.  Unlike the cases just described, Skilling involved neither terrorism nor murder, and it certainly did not involve the death penalty.  Instead, Skilling involved the trial of one of the former CEOs of Enron -- one of the world's leading energy companies at the time -- which collapsed and fell into bankruptcy in 2001 amid fraud.  Id. at 368.  "[T]he facts of the case were 'neither heinous nor sensational.'"  Id. at 369.

After being indicted on numerous counts of wire fraud, securities fraud, insider trading, making false representations to auditors, and conspiracy to commit fraud -- of which he was convicted of some charges and acquitted of others -- Skilling

July 18, 1997); United States v. Salameh, No. S5 93 Cr. 0180(KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993).  However, unlike here, there is no evidence that the amount of pretrial press, the personal impact stories, or the day-to-day focus on the events was any different in New York City than it was nationwide.  Unlike here, the Second Circuit noted "press coverage had substantially subsided by the time Yousef was brought to trial, and there was minimal publicity in the months immediately preceding his trial." United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003).  Also of note, New York City is significantly larger and more diverse than Boston; very few places are comparable to New York City.  Comparing New York to Boston is like comparing an apple to a bean, rather than apples to apples.

appealed, arguing that his trial should have been moved outside of Houston.  Id. at 375-76.  The Supreme Court rejected this argument due to a number of factors, all of which are readily distinguishable here.

First, it explained that Houston is "the fourth most populous city in the Nation."  Id. at 382.  Boston is not even in the top twenty.  See U.S. Census Bureau, Annual Estimates of the Resident Population for Incorporated Places of 50,000 or More, Ranked by July 1, 2013 Population: April 1, 2010 to July 1, 2013, May 2014, http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.  Moreover, the Skilling Court noted that in a survey of potential jurors commissioned by Skilling, "only 12.3% of Houstonians named [Skilling] when asked to list Enron executives they believed guilty of crimes"; "two-thirds of respondents failed to say a single negative word" about Skilling; and "43% either had never heard of Skilling or stated that nothing came to mind when they heard his name."  561 U.S. at 382 n.15.  Here, by contrast, Tsarnaev notes that 94% of potential jurors who filled out a questionnaire had been exposed to "moderate" or "a lot" of publicity.  Independent news articles report similar findings.[43]  Unlike in Skilling, where it was

_____

[43]  See, e.g., In Matters of Justice, It's Personal, Boston Globe, Feb. 6, 2015, https://www.bostonglobe.com/opinion/2015/02/05/matters-justice-personal/1HXYIwyRx22d4Pvtxh2SOJ/story.html (noting that a SocialSphere survey of 1000 Massachusetts residents found that 90% thought Tsarnaev was guilty or probably guilty); Shira

possible to know about the Enron scandal without knowing that Skilling was personally involved, Tsarnaev and the Boston Marathon bombings are one and the same; it is impossible to be aware of one and not the other.

Second, the Skilling Court examined the pretrial publicity and emphasized that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." Id. at 382. It added that the "[p]retrial publicity about Skilling was less memorable and prejudicial" and that there was "[n]o evidence of the smoking-gun variety [which] invited prejudgment of his culpability." Id. at 383. Here, by contrast, in the midst of the manhunt, the media showed surveillance video of Tsarnaev with a backpack moments before the bombing, plastered Tsarnaev's photograph everywhere imaginable, and broadcast live the scene of him being found hidden in a boat, covered in blood, and his subsequent arrest. Further reports over the next few weeks and months revealed his note written inside the boat, which was described by many as a

_____

Schoenberg, Dzhokhar Tsarnaev Trial: Judge, Lawyers Sift Through Potential Jurors' Ties to Boston Marathon Bombing, MassLive (Jan. 16, 2015), http://www.masslive.com/news/boston/index.ssf/ 2015/01/dzhokhar_tsarnaev_trial_judges.html ("Given the enormous publicity surrounding the bombings, it would be nearly impossible to find jurors who are unfamiliar with the case.").

"confession."[44]  And less than five weeks ago, on the morning jury selection began, the media reported that Tsarnaev offered to plead guilty in exchange for the government removing the death penalty but that the government rejected the offer.[45]  Thus, unlike in Skilling, here there is blatantly prejudicial pretrial publicity. This fact directly cuts against the government's argument that there "have been no reports of a criminal history, of an offer to plead guilty, of a confession to other crimes, or of damaging last-minute admissions."

Third, the Skilling Court explained that "over four years elapsed between Enron's bankruptcy and Skilling's trial" and that "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  Id. at 383.  As explained above, it has been less than two years since the Marathon bombing, and while the level of media attention has diminished somewhat, it is still extremely strong and prevalent, especially in

_____

[44]  See, e.g., Boston Bombings Suspect Dzhokhar Tsarnaev Left Note in Boat He Hid in, Sources Say, CBS News (May 16, 2013), http://www.cbsnews.com/news/boston-bombings-suspect-dzhokhar-tsarnaev-left-note-in-boat-he-hid-in-sources-say/ ("Boston bombing suspect Dzhokhar Tsarnaev left a note claiming responsibility for the April 15 attack on the Boston Marathon . . . .").

[45]  See, e.g., Evan Pérez, Boston Bombing Trial Lawyers Fail to Reach Plea Deal, CNN (Jan. 5, 2015), http://edition.cnn.com/2015/01/05/politics/dzhokhar-tsarnaev-trial-plea-deal-fails/index.html ("The discussions in recent months have centered on the possibility of Tsarnaev pleading guilty and receiving a life sentence without parole . . . . [b]ut the talks have reached an impasse because the Justice Department has resisted removing the death penalty . . . .").

Massachusetts.[46]  The emotional salience of these ongoing reports cannot be overstated.

Fourth, the Court rejected Skilling's argument that the "sheer number of victims" triggered a presumption of prejudice because the "jurors' links to Enron were either nonexistent or attenuated."  Skilling, 561 U.S. at 384.  While many people in Houston had links to Enron or the energy sector, many also had no connection.  See United States v. Skilling, 554 F.3d 529, 560 n.47 (5th Cir. 2009), aff'd in part, vacated in part, 561 U.S. 358 (2010) ("Skilling offered opinion polls suggesting that one in three Houston citizens 'personally kn[e]w' someone harmed by what happened at Enron.").  This situation is different.  It is true that a number of Eastern Division of the District of Massachusetts residents were not at the Marathon, did not know anyone at the Marathon, or were not personally subject to the shelter-in-place order.  Still, they were nevertheless affected because the entire city of Boston was the intended victim of the bombings.[47]  That is

---

[46]  See, e.g., The Associated Press, Marathon Bombing Aftermath Was Top Massachusetts Story of 2014, MassLive (Dec. 26, 2014), http://www.masslive.com/news/index.ssf/2014/12/marathon_bombing_a ftermath_was.html ("The legal aftermath of the Boston Marathon attacks dominated headlines in Massachusetts in 2014, much as the attack itself did last year . . . ."); Timeline: Dzhokhar Tsarnaev in the Globe, Boston Globe, Dec. 24, 2014, http://www.bostonglobe. com/2014/12/24/timeline-dzhokhar-tsarnaev-globe/16QJTbj8ql5dKhNGv MuVFJ/story.html (collecting every Boston Globe news story related to Tsarnaev).

[47]  See, e.g., Jonel Aleccia, Boston Bomb Attack Triggered PTSD in Local Kids, Study Finds, NBC (May 30, 2014), http://www.nbcnews.com

the whole point of terrorism -- not just to kill or injure a few innocent people, but to make everyone scared and make everyone believe it could have been them or that they could be next.  To further the point, it took just one day to qualify thirty-eight prospective jurors in Skilling.  Skilling, 561 U.S. at 374.  Here, it took eleven days to qualify forty-one.

Finally, the Supreme Court agreed with Skilling that a co-conspirator's "well-publicized decision to plead guilty shortly before trial created a danger of juror prejudice," but found that any prejudice was lessened due to the district court granting a continuance and addressing the issue during voir dire.  Id. at 384-85 (internal quotations marks omitted).  Once again, the situation could not be more different here.  In the midst of jury selection, three relevant events have occurred: the Charlie Hebdo shooting and manhunt in Paris,[48] the Finish Line "Snowmaritan,"[49] and the guilty

---

/health/health-news/boston-bomb-attack-triggered-ptsd-local-kids-study-finds-n118856 (noting that "in addition to [PTSD], researchers detected a range of other disturbing emotional and behavioral responses in kids who felt the impact of the manhunt close to home," and that "[e]veryone in Boston has a story of what they did during the shelter-in-place request"); Alan GreenBlatt, Boston on Lockdown: "Today Is So Much Scarier", NPR (Apr. 19, 2013, http://www.npr.org/blogs/thetwo-way/2013/04/19/177934915/The-Scene-In-Boston-Today-Is-So-Much-Scarier.

[48] See, e.g., Kevin Johnson, Paris and Boston Attacks Pose Striking Parallels, USA Today, Jan. 9, 2015, http://www.usatoday.com/story/news/nation/2015/01/08/paris-boston-attacks/21445461/ (commenting that "there was no escaping the striking similarities between the assault on the Paris offices of a popular satirical newspaper and the 2013 Boston Marathon bombings" and quoting Massachusetts Representative William Keating as stating that "[a]gainst the

plea of Khairullozhon Matanov – a friend of Tsarnaev who is accused of destroying evidence related to this investigation.[50] Unlike in Skilling, the district court has refused to delay the proceedings by even a day,[51] and a review of the questionnaires and voir dire reveals that whether these topics have had any prejudicial affect on the jury has not been deeply probed.[52]

### 4. If Not Here, When?

If a change of venue is not required in a case like this, I cannot imagine a case where it would be. The entire city of Boston has been terrorized and victimized, and deep-seated

backdrop of jury selection . . . , it's like Boston is reliving what happened all over again. . . . I'm watching what's happening in Paris, and I'm thinking of Watertown.").

[49] See, e.g., Meg Wagner & Jason Silverstein, Boston Bartender Chris Laudani Clears Snow from Boston Marathon Finish line as Massachusetts Begins Blizzard Cleanup, N.Y. Daily News, Jan. 28, 2015, http://www.nydailynews.com/news/national/boston-begins-blizzard-cleanup-clears-marathon-finish-line-article-1.2094673.

[50] See, e.g., Milton J. Valencia, Tsarnaev Friend to Plead Guilty, Boston Globe, Jan. 13, 2015, http://www.bostonglobe.com/metro/2015/01/13/judge-sets-jan-plea-hearing-for-friend-boston-marathon-bombers/SPbRARYlkYS5XYJMrZNFcM/story.html.

[51] See, e.g., The Associated Press, Judge Rejects Bid to Delay Tsarnaev Trial over Paris Attacks, Boston Herald, Jan. 14, 2015, http://www.bostonherald.com/news_opinion/local_coverage/2015/01/judge_rejects_bid_to_delay_tsarnaev_trial_over_paris_attacks.

[52] At the hearing, Tsarnaev explained that all of these events occurred after the questionnaires were filled out, and while the district court has generally asked prospective jurors whether they were aware of these events, it has cut off questioning into how in-depth this knowledge is or how it has affected the prospective juror.

prejudice against those responsible permeates daily life. If residents of the Eastern Division of the District of Massachusetts did not already resent Tsarnaev and predetermine his guilt, the constant reporting on the Marathon bombing and its aftermath could only further convince the prospective jurors of his guilt. Adding the death penalty element to these circumstances, and the makings for a presumption of prejudice abound. If a presumption does not exist here, when would it? How big must a terrorist attack be? How numerous and widespread must the body count and impact be? How pervasive and detailed must the coverage be before a federal court must presume the existence of prejudice?

By refusing to grant a change of venue in this case -- one of the most well-known, well-publicized, and emotionally-resonant terrorist attacks ever to go to trial -- both the district court and the majority are suggesting that there could never be a case which mandates a change of venue. If their decisions are allowed to stand, we might as well erase Rule 21(a) from the Federal Rules of Criminal Procedure, some of the due process principles from the Fifth Amendment, and the "impartial jury" phrase from the Sixth Amendment.[53]

---

[53] Another option, which none of the parties have suggested, would be to select jurors from another jurisdiction and then bring them to the District of Massachusetts for the trial. Though this practice is very rare, it is not unheard of. See Commonwealth v. Moore, Docket No. 169, Crim. No. 2011-10023, at *3, 5 (Mass. Sup. Ct. Oct. 5, 2012) (ordering a "partial change in venue" whereby the trial would be held in Suffolk County but the jury would be

## B. A Failure to Act Will Cause Irreparable Harm

The second requirement for a writ of mandamus to issue is that a defendant must show "relief is necessary to prevent irreparable harm." In re Justices of the Supreme Court of P.R., 695 F.2d 17, 20 (1st Cir. 1982). This requirement has been satisfied here as well. Should the jury selection process fail to select a fair and impartial jury, the "widespread public comment" in a case of this magnitude would "creat[e] additional difficulty in beginning again at another place for trial." McVeigh, 918 F. Supp. 1467. Any subsequent jury would be exposed to even more prejudicial publicity about the case. For example: it would be exposed to the daily events of the first trial; it would be exposed to the testimony given by the victims, the witnesses, and the experts; and it would be exposed to all the evidence presented by the government. Not only would it be exposed to this evidence, it would be exposed to outside commentary on the evidence as well. But, perhaps most harmfully, a subsequent jury could be expected to know that the new trial was the result of a post-conviction reversal. Thus, the new jury would know that Tsarnaev had already been convicted by a prior jury, with his guilt already proven once beyond a reasonable doubt. The jury might likely conclude that the retrial is due only to a perceived "technicality," and as a result, any pretrial prejudice may be even stronger at a retrial. While

"draw[n] from a Worcester County jury venire").

-71-

this is, of course, a concern in any situation where a conviction is reversed on appeal, very few, if any, cases have the press coverage and widespread dissemination of information that are present here. Thus, contrary to the majority's position, the fact that Tsarnaev, should he be convicted, will be able to raise his arguments in an appeal does not defeat the irreparable harm prong.[54]

---

[54] The majority misunderstands the nature of modern media coverage of high-profile criminal trials, and the distinction between prior coverage in Boston versus the rest of the country. Since the Marathon bombing, media coverage of the story has never ceased in Boston, where the story remains present and at the fore of the public's interest. On the national stage, however, in the two-year gap between the bombing and the start of jury selection, media coverage has waned and pales in comparison to local coverage. Nonetheless, given the American experience with high-profile criminal trials over the past few decades, there is every reason to expect that the national news media (including 24-hour cable channels, radio, print newspapers, social media, and internet sources) will ramp up with Tsarnaev's trial and engage in the relentless, highly detailed, omnipresent coverage that characterized criminal trials such as those of O.J. Simpson, Casey Anthony, the Menéndez Brothers, Jeffrey Dahmer, Phil Spector, and Ted Bundy. See, e.g., Casey Anthony Murder Trial Garners Extensive Media Coverage: Cable and Broadcast TV Coverage Draws Comparison to the Trials of O.J. Simpson and the Menéndez Brothers, L.A. Times, July 6, 2011, http://articles.latimes.com/2011/jul/06/entertainment/la-et-casey-anthony-trial-sidebar-20110706 (noting, among other things, that "[m]ore than 600 press passes were doled out for media coverage, and every major broadcast network has had at least one reporter at the trial"); see also Emily Shire, From O.J. to 'Serial': We're All Armchair Jurors Now, The Daily Beast (Jan. 23, 2015), http://www.thedailybeast.com/articles/2015/01/23/from-o-j-to-serial-we-re-all-armchair-jurors-now.html ("It's the 20th anniversary of the start of O.J. Simpson's trial, a media event which led to an explosion of courtroom TV and loud legal experts . . . ."); id. ("The 24-hour cable news network meant that the murder trial was transformed into a celebrity-making machine. Simpson, his defense team, his prosecutors, the judge, and cable legal analysts all became characters in the most gripping drama on television."); id. ("Transforming television viewers into jurors who were chomping at the bit to declare guilt or innocence drove the media coverage

Another consideration the majority fails to adequately consider is the harm that will be done to the judicial system as a whole. In In re Cargill, Inc., 66 F.3d 1256 (1995), a case involving a mandamus petition for a judge's recusal, we held that "[p]ublic confidence in the courts may require that such a question be disposed of at the earliest possible opportunity." Id. at 1262. Though the issue here is change of venue and not recusal, the concern over "public confidence" is just as vital. It is not just Tsarnaev that is on trial as a result of the issues before us, but also the integrity of our federal judicial system. The entire world is watching to see how the American values of "innocent until proven guilty" and "the right to a fair trial" -- values we proudly proclaim -- are applied in the toughest of cases, where the most allegedly despicable of defendants are on the docket. The actions taken by the district court cast doubt on the tenets by which our entire system is based, and it is thus necessary for us to act.

There is serious doubt in the public sphere that Tsarnaev can receive a fair trial in the District of Massachusetts. Major papers throughout the world have published articles suggesting that the trial should be moved outside of Boston.[55] For example, a

_____

of the most sensationalized trials of the next 20 years: Scott Peterson, Casey Anthony, Jodi Arias.").

[55] See, e.g., Joe D'amore, Tsarnaev Trial Should Not Be in Boston, Gloucester Times, Feb. 9, 2015, http://www.gloucestertimes.com/opinion/letter-tsarnaev-trial-should-not-be-in-boston/article_815 5d310-7ba2-5046-a9aa-5406973c3df6.html; Thomas Farragher, Tsarnaev

survey of 1,000 Massachusetts residents showed that only 47% of those polled were confident that Tsarnaev would receive a fair trial.[56] While only 8% were not at all confident, the other 43% (2% of the respondents were unaccounted for) had varying levels of doubt as to whether or not Tsarnaev could receive a fair trial.[57] Many legal publications agree.[58] But perhaps most notably, prospective jurors themselves have stated that "it will be very tough to find an impartial jury this close to the crime," that the

Trial Should Be Moved to Another Venue, Boston Globe, Feb. 7, 2015, https://www.bostonglobe.com/metro/2015/02/06/tsarnaev-trial-should-moved-another-venue/5HovPmXy1dTyv1XhV5VzSI/story.html ("Most potential jurors don't think Tsarnaev is guilty. They know he's guilty."); Danny Cevallos, Can Tsarnaev, Hernández, Holmes Get Fair Trials?, CNN (Jan. 29, 2015), http://www.cnn.com/2015/01/28/opinion/cevallos-major-trials-pretrial-publicity/; Thaddeus Hoffmeister, The Judge Should Rethink His Decision to Try Tsarnaev in Boston, N.Y. Times, Jan. 7, 2015, http://www.nytimes.com/roomfordebate/2015/01/07/when-a-local-jury-wont-do/the-judge-should-rethink-his-decision-to-try-tsarnaev-in-boston; Richard Lind, The Judge's Decision in the Tsarnaev Case Sets a Bad Precedent, N.Y. Times, Jan. 7, 2015, http://www.nytimes.com/roomfordebate/2015/01/07/when-a-local-jury-wont-do/the-judges-decision-in-the-tsarnaev-case-sets-a-bad-precedent-19; Harvey Silverglate, Why the Tsarnaev Trial Should Be Moved, Delayed, Boston Globe, Jan. 2, 2015, http://www.bostonglobe.com/opinion/2015/01/02/why-tsarnaev-trial-should-moved-delayed/K2is6uVCo179w6JzDLvZYJ/story.html.

[56]  In Matters of Justice, It's Personal, Boston Globe, Feb. 6, 2015, http://www.bostonglobe.com/opinion/2015/02/05/matters-justice-personal/1HXYIwyRx22d4Pvtxh2SOJ/story.html.

[57]  Id.

[58]  See, e.g., Andrew Cohen, Can Tsarnaev Get a Fair Trial in Boston? Of Course Not., Brennan Center for Justice (Jan. 9, 2015), http://www.brennancenter.org/analysis/can-tsarnaev-get-fair-trial-boston-course-not.

trial is a "waste of time and money," and that "there is no way [the juror] could be impartial."[59]

Yet, instead of alleviating any doubt as to the fairness of the proceedings, the district court has repeatedly refused to grant Tsarnaev's motions for change of venue. Not only that, it often refuses to act at all. Tsarnaev filed his second motion for change of venue on December 1, but the district court sat on the motion for a month before issuing its denial. In addition to this being just five days before jury selection was to begin, it was also New Year's Eve. Unfortunately, the district court went further and criticized Tsarnaev for filing the motion to begin with. See Op. and Order, Jan. 2, 2015, Case No. 13-10200, ECF No. 887, 1-6 (characterizing the motion as an ill-timed and delayed motion for reconsideration despite Tsarnaev's attempt to supplement the record with additional facts and reports supporting community bias). A similar practice occurred when Tsarnaev filed his third motion for a change of venue. Again, the district court failed to act promptly. It sat on the motion for sixteen days and only issued an order once the instant petition for mandamus was filed. The district court did, however, immediately act to chastize Tsarnaev's defense team for publicly including quotes from the jury

---

[59] It is worth noting that many other prospective jurors conveyed similar sentiments regarding the unlikely prospect of Tsarnaev receiving a fair trial. While these prospective jurors were hopefully struck for cause, their comments only further highlight the strong views in the community.

questionnaires.  See Text Order, Jan. 22, 2015, Case No. 13-10200, ECF No. 983.  Though there may have been legitimate reasons for these delays and criticisms, to the public, these actions may suggest that Tsarnaev's attorneys are being punished for doing their jobs.[60]

Rather than stepping in to remedy this appearance of injustice and restore faith in the system before its integrity is irreparably damaged, the majority has largely sidestepped the issue.  As I noted in my dissent to Tsarnaev's first petition for mandamus, the majority denied his petition within hours of receiving the complete briefing.  In re Tsarnaev, 775 F.3d 457, 457-59 (1st Cir. 2015) (Torruella, J., dissenting).  In today's opinion, it likewise focuses not on the merits, but the "onerous" burden Tsarnaev must overcome.

Let us recap: Tsarnaev was filmed being arrested after a four-day manhunt; the entire city, which in itself is a victim, came together and adopted "Boston Strong" as a sign of camaraderie; national media outlets had essentially stopped covering the bombing and its aftermath prior to trial, but the local news (both

---

[60] See, e.g., Alysha Palumbo, Tsarnaev Lawyers Defend Use of Juror Quotes to Move Trial, New England Cable News (Jan. 23, 2015), http://www.necn.com/news/new-england/Boston-Marathon-Bombing-Suspect-Dzhokhar-Tsarnaev-Jury-Selection-Continues-289565681.html; Pete Williams, Judge Chides Tsarnaev Lawyers for Releasing Jurors' Comments, NBC (Jan. 22, 2015), http://www.nbcnews.com/news/us-news/judge-chides-tsarnaev-lawyers-releasing-jurors-comments-n291636.

television and print) continue to report on it daily; jury selection is being conducted in the Moakley Courthouse, which is just a few miles from the Marathon's finish line, and which has become a heavily guarded fortress surrounded by a media circus; the district court has been slow in acting on Tsarnaev's motions and repeatedly criticizes his attorneys for zealously advocating on his behalf; and when Tsarnaev seeks relief from this court, a majority rebuffs his pleas. This is not the kind of "American Justice" that is expected of the federal courts, particularly in a criminal death-penalty case of this magnitude and import.

As Justice Sotomayor opined in <u>Skilling</u>, "our system of justice demands trials that are fair in both appearance and fact." <u>Skilling</u>, 561 U.S. at 464 (Sotomayor, J., concurring in part and dissenting in part). By failing to act now, the majority is only furthering the perception that this whole trial has a pre-ordained outcome and that our "guarantee of due process" is nothing but an empty promise. <u>See</u> <u>Rideau</u>, 373 U.S. at 726 ("Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality. . . . The kangaroo court proceedings in this case involved a more subtle but no less real deprivation of due process of law.").

A mandamus order from this court could have saved the district court's clear error, avoided some of the danger of mistrial on the basis of a prejudiced jury pool, and precluded the

irreparable harm that, thanks to the media circus bound to form around this trial, would mar any subsequent trial for Tsarnaev in the event of such a mistrial or reversed conviction. Such irreparable harm is not limited to Tsarnaev himself, but also extends to the damage done to the credibility and integrity of our legal system. With today's decision, any chance of avoiding such harm is now gone.

## C. The Equities Favor Transfer

Finally, for the writ to issue, the equities, on balance, must favor the petition. In re Bulger, 710 F.3d at 45. Such is the case here. Even assuming this is a "close case," which I do not think it is, we should err on the side of caution. Again, let us not forget, this is a death penalty case. As the Supreme Court stated in Irvin, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion." 366 U.S. at 728. The government, the district court, and the majority have failed to proffer any strong, persuasive case or reason why the equities should weigh against transfer. Indeed, their supposedly strongest point -- that "the trial be held where the crimes were committed" so that, in part, "[m]embers of the community will have access to the trial and to the court room," ante, at 33-34 -- is factually inaccurate. While the trial may be held where the crime was committed, the public will not have access. Instead, the public and the victims

will be relegated to "overflow" rooms where they can watch the proceedings on closed-link video cameras.  There is no reason that a trial being held in a different district could not similarly be broadcast.  Indeed, that is exactly what happened in McVeigh. Accordingly, any legitimate doubt that Tsarnaev cannot receive a fair trial tips the equities in favor of issuing the writ and requiring a transfer out of this district.

### III.  Conclusion

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin, 366 U.S. at 722.  As I have explained above, almost the entire pool of potential jurors has been compromised by the Boston Marathon bombings in one respect or another.  Even though potential jurors may have the best of intentions, I believe it is impossible to empanel a jury in this jurisdiction that is impartial, let alone indifferent.

I understand what this trial means for the community: an opportunity for closure, a sense of justice.  But what makes both America and Boston strong is that we guarantee fundamental constitutional rights to even those who have caused us the greatest harm.  Rather than convicting Tsarnaev and possibly sentencing him to death based on trial-by-media and raw emotion, we must put our emotions aside and proceed in a rational manner.  This includes guaranteeing that Tsarnaev is given a fair trial and accorded the

utmost due process.  The actions of the district court and the majority of this court fall short of these ideals.

Tsarnaev is entitled to a writ of mandamus ordering the district court to grant Tsarnaev's motion for a change of venue. Because this court refuses to grant this relief, I strongly dissent.